**John M. PEARCE, Plaintiff,**

v.

**The E.F. HUTTON GROUP, INC., et al., Defendants.**

**Civ. A. No. 86–0008.**

United States District Court, District of Columbia.

July 14, 1987.

1492

Stephen G. Milliken, Greta Van Susteren and John P. Coale, Washington, D.C., for plaintiff.

Earl J. Silbert and Allen V. Farber, Washington, D.C., for defendant Bell.

John Walsh and Harvey Spear, Cadwalader, Wickersham & Taft, New York City, for defendant Hutton.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the court upon defendant Griffin B. Bell's motions for partial summary judgment and for summary judgment. After hearing oral argument on these motions on March 9, 1987, and after considering the underlying papers, plaintiff's oppositions, and the entire record in this case, this court will grant the motion for partial summary judgment, and grant in part and deny in part the motion for summary judgment for the reasons stated below.

## I. BACKGROUND

On May 2, 1985, E.F. Hutton & Company, Inc. ("Hutton"), a wholly owned subsidiary of defendant, The E.F. Hutton Group, Inc. ("Hutton Group"), pled guilty in the United States District Court for the Middle District of Pennsylvania to 2,000 counts of mail and wire fraud. The Department of Justice decided not to prosecute individual Hutton executives and instead accepted a plea from Hutton to pay a $2 million fine, reimbursement to the government for its costs, and restitution to defrauded banks.

Hutton was also enjoined from engaging in certain cash management practices.

The scandal and the Justice Department's handling of it led to a number of government probes and much public debate. As a result, the Hutton Group hired Griffin B. Bell and the law firm of King & Spalding in May, 1985 to conduct an investigation of the cash management program at Hutton which had resulted in the guilty plea. Based on this investigation, a report entitled "The Hutton Report" was issued on September 4, 1985 and was made available to the public by Mr. Bell at a press conference held in Washington, D.C. on the following day.

The Hutton Report named a number of individuals as responsible for the fraudulent practices [1] that resulted in Hutton's guilty plea. The report also recommended certain sanctions for them. Among those deemed responsible for the fraud was John M. Pearce. Mr. Pearce had been branch manager of the Hutton office in St. Louis. After publication of the report, he was removed from that position, transferred to Florida, and eventually left the firm alto-

---

1. The fraudulent practices at issue here are called overdrafting and chaining. Both earned interest for Hutton by working off of "float"— the time delay in clearing checks.

   To see how these practices worked, one must understand Hutton's cash management system, which was created to move customer deposits from the branch level to the national level on the same day that the branch received the funds. To do this, Hutton maintained its accounts at banks giving it one-day availability to checks deposited there. Funds were typically transferred in the early afternoon when regions would "drawdown" their branches' customer receipts by depositing, in the regional bank accounts, checks drawn on the branch accounts. The national level would then drawdown the regional bank accounts later that same day.

   The branches would call their regions to tell them how much to drawdown. Since customer deposits continued to come in after that, however, Hutton created a practice of overdrafting. This overdrafting kept branch office banks from holding onto the additional customer deposits until the next day's drawdown. Basically, the amount of the overdraft was to be based on the anticipated customer deposits to be received after the amount of the drawdown was communicated to the regional level. If a branch overestimated its expected customer deposits, the deficit caused by the overdraft would be covered by

so-called "branch reimbursement checks" (BRC's) which drew on a national level account. Because of this, there was never any danger that the overdraft would not be paid.

   The practice was abused, however, when branches would overdraft amounts much larger than anticipated customer deposits. This meant there was always a larger deficit being covered by BRC's. The deficit earned interest for the branch at the bank's expense because the bank gave Hutton one-day availability to the amount overdrafted while it had to wait several days for the BRC to clear.

   Chaining is even more complicated than overdrafting. In chaining, rather than the typical branch to region drawdown, a branch to branch drawdown was inserted. In the typical drawdown, the regional bank was geographically close to the branch banks. Thus there was no significant delay in clearing the drawdown checks and no problem with giving Hutton one-day availability to those funds. In a chain, however, a distant branch would drawdown another branch. Float was increased because while Hutton still got one-day access to the funds, the greater distances involved created delays in clearing the drawdown checks. Every extra day it took those checks to clear, Hutton earned interest on the money.

gether. The State of Virginia took action against Pearce by barring him from being a Hutton manager there for five years. Pearce was also required to report to the securities regulators of the various states where he had been registered that an adverse action had been taken against him by his employer and the State of Virginia.

Pearce filed suit on January 3, 1986 against the Hutton Group and Griffin Bell. He alleges that Bell was hired to produce a report that would place blame for the fraudulent cash management program with low level employees rather than with Hutton's senior officers. Besides being made a scapegoat, Pearce alleges that the report falsely states that he should have known his actions were illegal and in violation of firm policies and guidelines. Thus, plaintiff claims the Hutton Report libels him and places him in a false light. Plaintiff also charges that by mentioning him in the Hutton Report, defendants have misappropriated his name.

On April 16, 1986, this court denied the Hutton Group's motion to stay these proceedings pending arbitration. On April 28, 1986, that decision was appealed. On June 10, 1986, a stay of this action, pending the appeal, was granted solely with regard to defendant Hutton Group. The Circuit Court heard oral argument on the appeal (D.C.Cir. No. 86–5281) on February 17, 1987 but no decision has been issued as yet. The case regarding defendant Bell was scheduled to go to trial on March 2, 1987. On February 9, 1987, however, trial was postponed because several motions had been filed that convinced the court this case was simply not ready to proceed. Among the motions filed, were the two dispositive motions presently before the court.

Defendant Bell has filed a motion for partial summary judgment on the claims for punitive damages and the false light invasion of privacy claim. Bell has also filed a motion for summary judgment with respect to the remainder of plaintiff's claims.

Plaintiff's original oppositions to Bell's motions were stricken from the record by this court in an opinion filed February 12, 1987, because they relied on inadmissible evidence. Plaintiff filed new oppositions on February 18, 1987. Defendant Bell renewed a motion to strike plaintiff's oppositions because they purportedly violated Fed.R.Civ.P. 56 and Local Rule 108(h). Bell claimed the oppositions were replete with false statements and with arguments, assertions, and allegations that are not referenced to the record. On March 9, 1987, the court ruled from the bench and denied Bell's renewed motion to strike. Following that ruling, the court heard oral argument on the motions for summary judgment.

## II. BARS TO PLAINTIFF'S CLAIMS

As a preliminary matter, Bell argues that at least some of plaintiff's claims must be dismissed, regardless of how much supporting evidence plaintiff may have. First, plaintiff cannot raise a false light invasion of privacy claim since the applicable law is that of the State of Missouri, and Missouri does not recognize the false light invasion of privacy action. Second, plaintiff's misappropriation of name claim is inapplicable to the circumstances of this case. Finally, several of plaintiff's libel claims are not actionable since they involve statements that are absolutely privileged as expressions of opinion.

### A. Choice Of Law

To determine which law applies to plaintiff's false light claim, the forum must apply the choice of law principles of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). This court must therefore apply the District of Columbia's choice of law rules to the problem. This is no simple task. Choice of law issues in defamation actions have historically presented difficult problems for the courts,[2] and these problems have only been

---

2. In fact, William Prosser's oft-quoted truism states:

The realm of conflict of laws is a dismal swamp, filled with quaking quagmires, and inhabited by learned but eccentric professors

magnified with the emergence of modern approaches to conflict of laws.[3] As at least one commentator has noted, American courts now follow no less than ten different approaches, not one of which can claim the allegiance of a majority of states.[4]

### 1) Approach to conflict of laws in the District of Columbia

Until about thirty years ago, the territorialist or "vested rights" approach adopted by the first *Restatement of Conflict of Laws* dominated American conflicts law. E. Scoles & P. Hay, *Conflict of Laws* § 17.2, at 552 (1984). The District of Columbia abandoned that approach in *Tramontana v. S.A. Empresa De Viacao Aerea Rio Grandense*, 350 F.2d 468 (D.C.Cir. 1965), *cert. denied*, 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966).[5] In its place, a "governmental interest analysis" approach was adopted. *See generally* Milhollin, *The New Law of Choice of Law in the District of Columbia*, 24 Cath.U.L.Rev. 448 (1975).

Strictly speaking, interest analysis refers to the method developed by Professor Brainerd Currie. *See* R. Smolla, *Law of Defamation* § 12.03[5] (1986); Pielemeier, *Multistate Defamation, supra* note 2, at 396–98. Indeed, plaintiff appears to rely in part on arguments based on that form of interest analysis. Currie's approach, however, places heavy reliance on forum law. Pielemeier, *Multistate Defamation, supra* note 2, at 396–97. *See generally* B. Currie, *Selected Essays on the Conflicts of Laws* (1963). Yet recent choice of law decisions by the District of Columbia courts put no such reliance on forum law. Thus, it is clear that the District does not follow Currie's brand of governmental interest analysis.

Nevertheless, Currie's work provided the starting point for many of the current, policy-based approaches to conflict of laws. Among these numerous variations of interest analysis is the "most significant relationship" approach of the *Restatement (Second) of Conflict of Laws*. The *Restatement (Second)* developed over a seventeen year period which was marked by an at-first grudging and then a more whole-hearted acceptance of policy analysis. R. Cramton, D. Currie & H. Kay, *Conflict of Laws: Cases—Comments—Questions* 317 (1981). The end product combines presumptive jurisdiction-selecting rules with policy analysis. *Id.*

It is the *Restatement (Second)* that guides choice of law decisions in the District of Columbia.[6] The most significant

---

who theorize about mysterious matters in a strange and incomprehensible jargon.... In connection with interstate publication it offers peculiar and baffling difficulties.

Prosser, *Interstate Publications*, 51 Mich.L.Rev. 959, 971 (1953). *See also* R. Smolla, *Law of Defamation* § 12.03 (1986); Pielemeier, *Constitutional Limitations on Choice of Law: The Special Case of Multistate Defamation*, 133 U.Pa.L. Rev. 381, 391–93 (1985) [hereinafter, *Multistate Defamation*].

3. *See generally* J. McCarthy, *The Rights of Publicity and Privacy* §§ 11.3[A], 11.3[B] (1987); Pielemeier, *Multistate Defamation, supra,* note 2.

4. Kay, *Theory Into Practice: Choice of Law in the Courts*, 34 Mercer L.Rev. 521, 585–86 (1983). Even the Supreme Court has observed that each of the fifty states "applies its own set of malleable choice-of-law rules." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 252 n. 18, 102 S.Ct. 252, 264 n. 18, 70 L.Ed.2d 419 (1981).

5. At the time of this decision, the United States Court of Appeals for the District of Columbia Circuit had the authority to review judgments of the District of Columbia Court of Appeals. This power was eliminated by Congress as of February 1971. Nevertheless, decisions by the United States Court of Appeals for the District of Columbia Circuit prior to February 1971 constitute the case law of the District of Columbia. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

6. *See, e.g., Stancill v. Potomac Electric Power Co.*, 744 F.2d 861, 864 n. 16 (D.C.Cir.1984) ("The District of Columbia Court of Appeals has adopted the approach of the Restatement (Second) of Conflict of Laws."); *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1030 n. 22 (D.C.Cir.1973) (choice of law depends on which state "bears the more significant relationship to the parties"; citing Restatement (Second) of Conflict of Laws §§ 188, 204 (1971)); *Godbey v. Frank E. Basil, Inc.*, 603 F.Supp. 775, 777 n. 8 (D.D.C.1985) ("The District of Columbia has generally adopted the Restatement (2d) of Conflicts governmental interest analysis approach to deciding choice of law questions in tort cases.").

relationship approach [7] has even been used by this jurisdiction in other defamation/invasion of privacy cases.[8] Therefore, the *Restatement (Second) of Conflict of Laws* governs the choice of law issue in the case at bar.

### 2) False conflict analysis

■ The first step in deciding a choice of law problem is to determine whether there really is a conflict or whether the situation presents a "false conflict." [9] A false conflict exists when either (1) the potentially applicable laws do not differ, or (2) when, upon examination, one law—by its terms or underlying policies—is not intended to apply to a situation such as the one in issue. E. Scoles & P. Hay, *Conflict of Laws* at 17. Both concerns are raised in the instant case.

■ Plaintiff argues that the laws of the District of Columbia and of the State of Missouri do not truly differ as to the existence of a false light invasion of privacy claim under the facts of this case. It is clear that the District of Columbia does recognize the false light action. *See, e.g., Dresbach v. Doubleday & Co.*, 518 F.Supp. 1285, 1291 (D.D.C.1981); *Logan v. District of Columbia*, 447 F.Supp. 1328, 1332–34 (D.D.C.1978). The only issue is whether Missouri recognizes such a claim.

The key case on this issue is the decision in *Sullivan v. Pulitzer Broadcasting Co.*, 709 S.W.2d 475 (Mo.1986). In *Sullivan*, a plaintiff was found to have filed a suit for defamation under the guise of an action for false light invasion of privacy in order to avoid the shorter statute of limitations for defamation actions. *Id.* at 476. The plaintiff contended the defendant had published a false accusation (that he had stolen materials, plans, and labor from the City of St. Louis for his personal benefit) that publicly portrayed him in a false light. *Id.* at 475. In holding that the plaintiff could not treat his claim as anything other than a defamation action, the court expressly rejected providing a false light claim when "one party alleges that the other published a false accusation concerning a statement of fact." *Id.* at 481.

Though plaintiff Pearce is correct in pointing out that the Missouri court did leave open the possibility of a false light claim in other contexts, the instant case is clearly not among them. Pearce is alleging that defendants published false accusations about him—precisely the situation the court in *Sullivan* rejected as providing grounds for a false light claim. The *Sullivan* court noted only two situations in which it might possibly recognize the false light tort. *Id.* at 480. The first is when one publicly attributes to the plaintiff some opinion or utterance, harmful or not, that is false. The classic case would be where one claims the plaintiff wrote a book or poem that he did not. The second situation is when one uses another's likeness in connec-

---

7. District of Columbia courts have used a variety of different phrases to describe this approach. *See, e.g., McSurely v. McClellan*, 753 F.2d 88, 110 (D.C.Cir.) ("the state most concerned with the claim"), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1030 n. 22 (D.C. Cir.1973) ("the more significant relationship"); *Dowd v. Calabrese*, 589 F.Supp. 1206, 1210 (D.D. C.1984) ("the most significant interest"); *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C.1970) ("the more substantial interest"); *McCrossin v. Hicks Chevrolet, Inc.*, 248 A.2d 917, 920–21 (D.C.1969) (same).

8. *See McSurely v. McClellan*, 753 F.2d 88, 110 (D.C.Cir.) (typical *Restatement (Second)* analysis of grouping contacts and assessing other factors such as each state's relative experience with issue), *cert. denied*, —— U.S. ——, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Dowd v. Calabrese*, 589

F.Supp. 1206, 1210–11 (D.D.C.1984) (express reliance on *Restatement (Second)* rule that applicable defamation law is state where victim's reputation suffered injury).

9. Although testing for a false conflict is not expressly part of the *Restatement (Second)* approach, it is implicitly part of the general principles found in § 6(2), and is one of Currie's most important contributions to conflict of laws. The procedure has found widespread adoption in American courts. E. Scoles & P. Hay, *Conflict of Laws* 17, 44–45, 603–604 (1984). Furthermore, courts in the District of Columbia clearly employ this test as a preliminary step. *See Biscoe v. Arlington County*, 738 F.2d 1352, 1360 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985); *Gaither v. Myers*, 404 F.2d 216, 224 (D.C.Cir.1968); *Williams v. Rawlings Truck Line, Inc.*, 357 F.2d 581, 586 (D.C.Cir.1965).

tion with a story that has no bearing on the plaintiff. Obviously, neither of these scenarios is applicable to the case at bar. Therefore, since Missouri would not recognize Pearce's false light invasion of privacy claim, while the District of Columbia would, the potentially applicable laws are in apparent conflict.

The second step in determining whether a true conflict exists is to look at the differing laws and their underlying policies to see if they are all intended to apply to the situation at hand. By their terms, both Missouri's and the District's laws regarding false light actions are applicable to the present case. The underlying policies, however, are substantially different. The Missouri Supreme Court decision in *Sullivan* reflects that state's clear interest in refusing to allow false light actions to circumvent traditional restrictions on defamation claims. *Id.* at 480. Missouri has decided that defamation actions provide sufficient protection for its residents. Furthermore, the careful evaluation given the false light tort in *Sullivan*, as well as Missouri's much longer experience with privacy actions as compared to the District of Columbia's,[10] underscores the history and strength of Missouri's policy.

In sharp contrast, the District of Columbia has a rather nebulous policy underlying the false light tort. Cases involving such claims simply adopt the *Restatement* formulations for privacy torts without signifi-

cant analysis or evaluation of this type of claim. In fact, while the court in *Dresbach v. Doubleday & Co.*, found no reason to distinguish false light from defamation, 518 F.Supp. at 1288, it did not set forth any policy reason for simultaneously providing both causes of action.

Plaintiff has relied on language in *Phillips v. Evening Star Newspaper Co.* to argue that the District of Columbia has a policy of maximum protection for those placed in a false light. *See* 424 A.2d 78, 87 (D.C.1980), *cert. denied*, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981). *Phillips*, however, only discussed maximum protection in the context of a defamation action. Nothing was said to indicate that the District's policy of providing maximum protection to reputations also sought to provide plaintiffs with additional causes of action. It is just as plausible to presume that the false light tort was adopted solely to address concerns with privacy, rather than to augment the District's policy of maximum protection from defamation.

Even assuming the District's adoption of the false light tort is due to a policy of providing maximum protection, that policy would not be advanced here. Plaintiff was domiciled in Missouri. He lived and worked there for four years before the alleged invasion of privacy. Though plaintiff was at one time a domiciliary of the District, his residence ended by 1981 and has never been resumed.[11] If plaintiff was

---

**10.** Missouri recognized the privacy action in 1911, thirty-seven years before the District. *Compare Munden v. Harris*, 153 Mo.App. 652, 134 S.W. 1076 (1911) *with Peay v. Curtis Publishing Co.*, 78 F.Supp. 305 (D.D.C.1948). In fact, D.C. courts have often relied upon Missouri decisions in this area. *See Peay*, 78 F.Supp. at 308 (citing *Munden, supra*); *see also Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 653 (D.C.Cir.1966) (en banc) (citing *Baber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291 (1942)); *Vassiliades v. Garfinckel's*, 492 A.2d 580, 587–88 (D.C.1985) (citing *Baber, supra*).

**11.** Plaintiff argues that the District of Columbia remained his domicile because he did not intend to establish permanent residence in Missouri and because he intended to return to "the Washington area." The record does not support such an argument. Plaintiff's position at the Hutton offices in St. Louis, and the length of

time he worked there, strongly suggests an intention to reside there indefinitely, if not permanently. Missouri was not simply plaintiff's residence in fact—it was his home. *See Anwo v. Immigration and Naturalization Service*, 607 F.2d 435, 437 n. 7 (D.C.Cir.1979).

Furthermore, even if an intention to return to the "Washington area" could somehow establish one's domicile in the District of Columbia, plaintiff has failed to substantiate such an intention. There is no indication plaintiff remained registered to vote in the District. Additionally, at a deposition plaintiff testified four times to an intention to return only to "the east coast" before finally mentioning Washington. His wife testified, however, that the couple intended to settle on the Eastern Shore of Maryland, and said nothing of Washington.

Lastly, while plaintiff claims to have retained property in the District until 1986, his wife has testified that they sold their D.C. home and only

not (and is not now) domiciled in the District of Columbia, the District's interests will not be advanced by an application of D.C. law.

Since plaintiff was in St. Louis at the time Bell published his report, however, Missouri interests will be advanced by application of that state's law. Missouri has determined that the false light tort is unnecessary to protect its residents—one of them being the plaintiff. Missouri has a greater interest in protecting free speech. Therefore, the case at bar presents a "false conflict." The only interested state is Missouri, which does not recognize the false light invasion of privacy claim.

### 3) True conflict and the state with the most significant relationship

■ Even assuming *arguendo* that there was a true conflict, Missouri has the most significant relationship to the occurrence and the parties, with respect to the false light claim. Under the *Restatement (Second)*, the identification of "the state with the most significant relationship" involves a two-step process of identifying the relevant contacts with the respective states and then evaluating their significance in the light of, first, detailed prescriptive rules and, second, the policy-oriented general principles found in section 6(2). R. Cramton, D. Currie & H. Kay, *Conflict of Laws: Cases—Comments—Questions*, at 319–20.

According to section 145(2) of the *Restatement (Second), the relevant contacts in tort cases are:*

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971).

Item (d) is not applicable to the instant case. Item (b) is the least controversial. The District of Columbia is clearly the place of conduct since it is here that defendant Bell issued his report and gave the press conference. Though Bell argues that the place of conduct also includes those states where his report was prepared and disseminated, the principal acts of communication (allegedly putting plaintiff in a false light) occurred in the District. In any event, as is discussed shortly, the place of conduct is not a significant contact in the context of defamation and invasion of privacy actions.

Items (a) and (c) are interrelated in the instant case. With regard to defendants, item (c) is not particularly relevant because neither Missouri nor the District are the domicile, residence, place of incorporation, or the principal place of business of the defendants. Reference to these contacts thus presents no means of determining which of the two jurisdictions has the stronger interest.

As to the plaintiff, however, domicile and residence are significant contacts. Plaintiff was a domiciliary of Missouri.[12] Furthermore, because plaintiff was residing there at the time of the alleged invasion of privacy, Missouri is also the location of item (a)—the place of injury. The place of injury plays a central role under *Restatement (Second)* analysis. For torts, this contact is the most important in the selection of the state of the applicable law. Restatement (Second) of Conflict of Laws § 145, comment (e), at 419. In contrast, the place of conduct plays a less important role, especially in a case such as defamation. *Id.* at 420. In the instant case, the place of injury is clearly Missouri. Though plaintiff has claimed he has numerous contacts and friends in the D.C. area, none of these are relevant to an invasion of privacy claim.

While plaintiff's contacts with the District might give him grounds to argue that

kept property on the Eastern Shore of Maryland. The court must therefore conclude that at any time relevant to the instant case, and particularly at the time of the alleged privacy invasion, plaintiff was not domiciled in the District of Columbia.

**12.** See note 11, *supra,* and accompanying text.

his reputation was injured here, reputation only relates to the defamation claim. Lumping defamation with invasion of privacy leads to error in choice of law because the two torts differ materially. *Bernstein v. National Broadcasting Co.*, 129 F.Supp. 817, 824–25 (D.D.C.1955), *aff'd*, 232 F.2d 369 (D.C.Cir.), *cert. denied*, 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239 (1956). Invasion of privacy is a personal injury—an injury to feelings. *Id.* at 825. Rules of privacy are designed to protect a person's interest in being let alone, not in one's reputation. Restatement (Second) of Conflict of Laws § 152, comment d. Clearly, an injury to one's feelings can only occur where the plaintiff is located at the time of the impact of the privacy invasion. *Bernstein*, 129 F.Supp. at 825–26. In the instant case, plaintiff was residing in Missouri at the time defendants issued their report.

Though the opinion in *Bernstein* was written during the first *Restatement* era, the decision to draw a distinction between the torts of defamation and invasion of privacy did not rely on the outdated choice of law rules of the territorialist approach. In fact, the distinction was noted and relied on by the *Restatement (Second)*. *See* Restatement (Second) of Conflict of Laws § 152, comment d.

Even if the place of injury ordinarily was not the most important contact in tort actions, the *Restatement (Second)* goes further and specifically provides that in cases of multistate invasion of privacy, the state with the most significant relationship will usually be the state where the plaintiff was domiciled. Restatement (Second) of Conflict of Laws § 153; *see also Crane v. Carr*, 814 F.2d 758, 760 (D.C.Cir.1987) ("[L]ibel and 'false light,' are the kind [of claims] in which the injury, foreseeably, is felt with greatest force in the place where plaintiff lives.").

Relying on the fact that rules of privacy are meant to protect feelings, the *Restatement's* drafters explained that the plaintiff's domicile should be the state of the most significant relationship because that is usually the state of the greatest injury. Restatement (Second) of Conflict of Laws § 153, comment d. The drafters went on to state that the law of the plaintiff's domicile will also be applied even though some or all of the defendant's acts were done in another state. *Id.*

The *Restatement (Second)*'s preference for applying the law of the plaintiff's domicile has received considerable judicial approval.[13] Though commentators have expressed concern that courts will choose plaintiff's domicile from "an unconsidered application" of section 153, *see* Pielemeier, *Multistate Defamation, supra* note 2, at 396, such fear would be misplaced in the case at bar. Even under the general principles of section 6(2),[14] the District of Columbia cannot be deemed to have a more significant relationship to the occurrence and parties. Examination of various contacts bolsters the application of Missouri law.

Plaintiff lived in Missouri for four years before the alleged invasion of privacy. He worked there for Hutton as a branch manager, the position in which he engaged in the activities in issue. He worked there twice as long as the two years he worked as branch manager in Maryland. He has not worked in the District of Columbia since the fall of 1979. Plaintiff and his wife apparently had at least as many friends and acquaintances in Missouri as in the District in 1985. In fact, she has

**13.** *See, e.g.*, B. Sanford, *Libel and Privacy: The Prevention and Defense of Litigation* 517 & n. 102 (1985) (and cases cited therein); R. Smolla, *Law of Defamation* § 12.03[4] & n. 97 (same); Pielemeier, *Multistate Defamation, supra* note 2, at 396 & n. 97 (same).

**14.** Section 6(2) provides that the factors relevant to choice of the applicable rule of law include:
  (a) the needs of the interstate and international systems,
  (b) the relevant policies of the forum,
  (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
  (d) the protection of justified expectations,
  (e) the basic policies underlying the particular field of law,
  (f) certainty, predictability and uniformity of result, and
  (g) ease in the determination and application of the law to be applied.

named more people with whom the couple maintained contact from Missouri than from the entire Washington metropolitan area. Contact with Washington friends has been infrequent.

Additionally, plaintiff left his job with Hutton in Missouri, moving to a position in Florida and ultimately leaving the firm. Plaintiff's privilege to manage a brokerage was suspended in Virginia, not the District. Although other states considered similar action, including Florida, Pennsylvania, and Missouri, apparently the District did not. Plainly, whatever contacts plaintiff has with the District of Columbia cannot outweigh the substantial connections that Missouri has with this issue.

Finally, the court turns to plaintiff's contention that there is a trend by courts to apply the law most favorable to plaintiff. This position is simply untenable. The *Restatement (Second)* states that the law selected under section 153 even determines whether a right to privacy is to be recognized at all. Restatement (Second) of Conflict of Laws § 153, comment b. Furthermore, none of the cases relied on by plaintiff to support the alleged "trend" dates from the past decade. In contrast, there are a number of recent cases choosing laws unfavorable to plaintiffs.[15]

■ Therefore, Missouri is the state with the most significant relationship to the false light claim. Since Missouri would not recognize plaintiff's false light action, the claim must be dismissed with prejudice.

### B. Misappropriation Of Name

■ Plaintiff argues that even if his false light claim is precluded, he can proceed on another invasion of privacy theory—misappropriation of name. The premise for this claim is that defendant used plaintiff's name and identity to gain substantial pecuniary benefit by having him serve as a scapegoat for Hutton's corporate abuses.

Plaintiff's theory is plainly implausible. There is no evidence that plaintiff's name was of any particular value or that it was included in the Hutton Report to take advantage of plaintiff's reputation or the value associated with his name. There is no evidence that defendant Bell's compensation was somehow dependent on including plaintiff's name in the Hutton Report.

The essence of a misappropriation of name action is that the defendant has used another's name to take advantage of some value associated with it—not merely for informational purposes. Restatement (Second) of Torts § 652C, comment d (1977). "Incidental use of name or likeness or publication for a purpose other than taking advantage of a person's reputation or the value associated with his name will not result in actionable appropriation." *Vassiliades v. Garfinckel's,* 492 A.2d 580, 592 (D.C.1985). In the case at bar, plaintiff has presented no evidence that defendants' use of his name was for anything other than for informational purposes. The misappropriation of name invasion of privacy claim must therefore be dismissed with prejudice.

### C. Absolute Privilege For Opinion

Defendant Bell claims that several of his allegedly defamatory statements are simply opinion, so summary judgment must be granted as to them. Indeed, the Supreme Court has recognized that statements of opinion are absolutely exempt from libel suits under the first amendment. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (dictum); *see also Ollman v. Evans,* 750 F.2d 970, 974–75 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

Distinguishing between what is fact and what is opinion, however, can often be a very difficult task.[16] In *Ollman v. Evans,*

---

**15.** *See, e.g., In re Yagman,* 796 F.2d 1165, 1170, 1171 (9th Cir.1986); *Fleury v. Harper & Row, Publishers, Inc.,* 698 F.2d 1022, 1025, 1028–29 (9th Cir.), *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *Weber v. National Railroad Passenger Corp.,* No. B–84–564 (WWE)

(D.Conn. May 7, 1986) [Available on WESTLAW, DCT database].

**16.** One commentator has noted that "no area of modern libel law can be murkier than the cavernous depths of this inquiry." B. Sanford, *Li-*

this Circuit addressed the problem and held that courts must "analyze the totality of the circumstances in which the statements are made to decide whether they merit the absolute First Amendment protection enjoyed by opinion." 750 F.2d at 979; *see also* R. Smolla, *Law of Defamation* § 6.08[3] (detailed discussion of implications of *Ollman* ). To evaluate the totality of the circumstances, the court set forth four factors to be considered in assessing whether the "average reader"[17] would view the statement as fact or, conversely, as opinion. *Id.*

First, the common usage or meaning of the specific language of the challenged statement must be analyzed. *Id.* This is to determine whether the statement has a precise meaning and thus is likely to give rise to clear factual allegations. *Id.* at 980. "The classic example of a statement with a well-defined meaning is an accusation of a crime." *Id.*

In the present case, Bell claims his statements, that plaintiff's actions were such that "no reasonable person could have believed that this conduct was proper" (Complaint at ¶ 21(d)) and were "so aggressive and egregious as to warrant sanctions" (Complaint at ¶ 21(g)), were mere expressions of opinion. So too, he claims, were his statements that plaintiff was "actually engaged in wrongdoing" (Complaint at ¶ 21(e)), and was a "moving force in improprieties" (Complaint at ¶ 21(f)).

There is nothing "loosely definable" or "variously interpretable" about Bell's statements. This is not a situation involving some indefinite epithet, such as the "fascist" accusation in *Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977), or the "sloppy and irresponsible reporting" criticism in *Cole v. Westinghouse*

*Broadcasting Co.,* 386 Mass. 303, 435 N.E.2d 1021, *cert. denied,* 459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 603 (1982).

■ To the average reader, Bell's statements mean, as a factual matter, that plaintiff knew his participation in chaining and overdrafting was wrong. The statements are equivalent to criminal accusations. In fact, at the press conference Bell not only stated that he tried to use something "pretty close to a criminal prosecution standard," but that he had, in fact, found criminal wrongdoing.[18] Transcript of September 5, 1985 press conference, at 19 & 49.

These statements are not just "broad, brush-stroked references" to unethical conduct, as was the use of the term "traitor" in *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). To the average reader or listener, unequivocal statements (by a former United States Attorney General and Federal Judge using a criminal prosecution standard) about deliberate wrongdoing are obviously laden with factual content. Thus, Bell's statements have a sufficiently definite meaning to convey facts.

■ The second factor to consider is the degree to which the statements are verifiable. *Ollman,* 750 F.2d at 981. An unverifiable statement cannot convey actual facts. *Id.* Obviously, verifiability is not a simple, black or white determination. The degree to which a statement is verifiable ranges over a spectrum rather than fitting into neat categories. The object of this inquiry is merely to determine whether a statement can be sufficiently proven so that a jury would not be rendering a decision based on speculation, or on the approv-

---

*bel and Privacy: The Prevention and Defense of Litigation* § 5.1 (1985).

**17.** The court noted that the object is to assess the average reader's view of the statement, rather than that of either the most skeptical or most credulous reader. 750 F.2d 979 n. 16.

**18.** Defendant attacks the accuracy of plaintiff's transcript of Bell's press conference. PARTIAL

REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT BELL'S MOTION FOR SUMMARY JUDGMENT AND TO DEFENDANT BELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT, at 11 n. 4. Nevertheless, Bell's Answer to the Complaint (as set forth in Exhibit 3 to the above PARTIAL REPLY) makes clear that he admits to stating that he found criminal wrongdoing.

al or disapproval of the contents of the statements, its author, or its subject.

In the case at bar, the statements are objectively capable of being proven or disproven. While the determination of whether plaintiff knew his conduct was improper necessarily involves an assessment of intent, fact finders routinely make such determinations in criminal actions. Bell's statements are verifiable under an objective, "reasonable person" standard.

■ The third factor to consider is the context in which the statement occurs. *Ollman*, 750 F.2d at 982. Whether a statement is factual depends in part on the publication, taken as a whole, of which the statement is a part. *Id.* The language of the entire publication may signal that a specific, apparently factual statement is really being used in a metaphorical, exaggerated, or even fantastic sense. For example, in *Myers v. Boston Magazine Co.*, 380 Mass. 336, 403 N.E.2d 376 (1980) a magazine's statement that a television sports reporter was "the only newscaster in town who is enrolled in a course for remedial speaking" was deemed protected opinion. Though the statement on its face appeared factual, it was in an article consisting of a series of "one-liners" about sports personalities. Thus, the average reader would have realized that he or she was reading opinions, and not being showered with facts.

In sharp contrast, the Hutton Report as a whole undercuts defendant's position that his statements were opinion. The average reader of such an investigative report would naturally assume that he or she was being presented with a compilation of facts. Another consideration in this respect is the inclusion of cautionary language in the text where the challenged statements are found. *Ollman*, 750 F.2d at 982. A reader encountering such language tends to discount what follows. *Id.* at 983.

Arguably, the inclusion of Bell's statements in the "Conclusions and Remedies" section of the Hutton Report, and the use of the words "We conclude" and "We think" in connection with those statements, amounts to cautionary language. In the context of this investigatory report, however, the language is more akin to a summary of facts than a subjective analysis of them. Furthermore, because the challenged statements set forth plaintiff's culpability, they imply the existence of damaging, undisclosed facts beyond the mere descriptions of the chaining and overdrafting activities given in the more detailed sections of the Hutton Report. *See* Restatement (Second) of Torts § 566 (1977). Therefore, the average reader would not have been put on notice that Bell's statements were opinions.

Even if defendant had put readers on notice with cautionary language, that one factor alone could not justify the absolute privilege given to expressions of opinion. As previously discussed, Bell's statements are unequivocal and amount to criminal accusations. When a statement is as factually laden as the accusation of a crime, cautionary language is essentially unavailable to dilute the factual implications. *Ollman*, 750 F.2d at 983. Thus, the immediate context of the allegedly defamatory statements indicates that they are factual assertions and not expressions of opinion.

■ Finally, the fourth factor to consider is the broader social context in which the statement appears. *Id.* Different types of writing have widely varying social conventions that signal to the reader the likelihood of a statement's being either fact or opinion. *Id.* at 979. As the court in *Ollman* noted, it is one thing to be called corrupt by a soapbox orator and quite another to be referred to that way in a research monograph. *Id.* at 983.

Little more need be said in the instant case than to point out that the alleged defamation occurred in the context of an independent counsel's report on his investigation of illegal corporate practices. In fact, the independent counsel was a former United States Attorney General and Federal Judge. The setting in which defendant's statements were delivered clearly would cause the reasonable person to view them as fact, not opinion.

Given the clear and verifiable meaning of Bell's statements, and given the serious and professional context in which they were made, the absolute privilege for statements of opinion is simply not available in the instant case.

## III. STANDARD OF FAULT AND BURDEN OF PROOF

Before reviewing the sufficiency of plaintiff's evidence, the level of fault and burden of proof must be established. These determine the amount of evidence plaintiff must have in order to bring his case before a jury. At this point, plaintiff's only remaining claims are for compensatory and punitive damages based on the defamation count.[19]

As to the standard of fault for both compensatory and punitive damages, defendant Bell contends he cannot be held liable unless it is established, by clear and convincing evidence, that he published the allegedly defamatory statements with actual malice. For compensatory damages, defendant bases this position on two arguments. First, his statements are protected by qualified privileges for fair comment and/or for good-faith disclosure of matters of public interest. Second, plaintiff is a limited-purpose public figure.

For punitive damages, Bell's position is based on the holding in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Plaintiff counters, however, by maintaining that a lesser standard of fault for punitive damages is permitted under the recent Supreme Court decision in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion).

As to the burden of proof, defendant argues that plaintiff must establish the falsity of Bell's statements by clear and convincing evidence. This position is based on a number of Supreme Court decisions.

Each of these arguments will be dealt with in turn.

### A. Qualified Privileges

#### 1) Privilege for fair comment

The doctrine of fair comment was a development at common law that evolved from the need to protect and encourage the free exchange of ideas. Franklin & Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity,* 25 Wm. & Mary L. Rev. 825, 855, 871 (1984); *see also* R. Smolla, *Law of Defamation* § 6.02. The doctrine was necessary because the common law considered all statements to be actionable, regardless of whether they were capable of being verified. Franklin & Bussel, *supra,* at 871.

Intuitive, evaluative statements, however, cannot be proven "true or false by the rigorous deductive reasoning of the judicial process." *Id.* Recognizing that valuable discourse is often furthered by such commentary, courts gradually developed shelter for these unprovable statements. *Id.* Though initially modest, the fair comment privilege eventually embraced all opinions about matters of public concern. R. Smolla, *supra,* at § 6.02[1].

While the fair comment privilege has been recognized in this jurisdiction, *see Afro-American Publishing Co. v. Jaffe,* 366 F.2d 649, 656 (D.C.Cir.1966) (en banc), it is clear that the doctrine is now obsolete in light of the broader first amendment protections afforded expressions of opinion. *Ollman v. Evans,* 750 F.2d 970, 975 n. 8 (D.C.Cir.1984) (en banc) (though claim arises under D.C.'s common law of libel, whether statements are protected opinion is a matter of constitutional law), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Hoffman v. Washington Post Co.,* 433 F.Supp. 600, 603 (D.D.C. 1977) (no need to determine whether fair comment privilege applicable since Su-

---

**19.** Defendant Bell has made no argument regarding the choice of law as to the defamation claim. At the hearing, counsel for defendant represented to the court that such an argument was unnecessary since there is no significant difference between the laws of Missouri and the

District regarding defamation. Given this and the fact that D.C. clearly has an interest in this case (conduct occurred here and plaintiff's reputation at least partly harmed here), the court will be governed by forum law on this issue.

preme Court has made privilege constitutional one under first amendment), *aff'd*, 578 F.2d 442 (D.C.Cir.1978).

■ Even if the doctrine was not obsolete, it would be inapplicable to the case at bar. The fair comment defense goes only to opinion, not to misstatements of fact. *Fisher v. Washington Post Co.*, 212 A.2d 335, 337 (D.C.1965). As previously discussed, Bell's statements are fact, not opinion. Therefore, the qualified privilege for fair comment cannot protect Bell here.

*2) Privilege for good-faith disclosure of matters of public interest*

The common law also developed several related conditional privileges based on the defendant's acting to further his self-interest, the interest of others, or a "common" interest. *See* R. Smolla, *supra*, at § 8.08. Indeed, the District of Columbia has recognized that a qualified privilege exists for disclosure of a "subject matter 'in which the party communicating has an interest or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty.'" *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C.1979) (quoting *May Department Stores Company v. Devercelli*, 314 A.2d 767, 773 (D.C.1973)).

Defendant Bell maintains that such a qualified privilege should exist for a "good faith disclosure of matters of public interest." The use of the phrase "good faith" adds nothing to the analysis here because a qualified privilege, by definition, only protects statements made in the absence of malice. *See Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C.1983) (qualified privilege is lost by showing of malice). Therefore, Bell's position comes down to an assertion that the court should interpose the shelter of a qualified privilege whenever a disclosure involves a matter of public interest.

In the instant case, defendant asserts that the matter of public interest was the 2,000 felony counts that Hutton had pled guilty to. What constitutes "a matter of public concern" has recently been addressed by the Supreme Court. In *Dun & Bradstreet, Inc. v. Greenmoss Builders,*

*Inc.*, Justice Powell relied on the opinion in *Connick v. Myers* to hold that "'[w]hether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record.'" 472 U.S. 749, 761, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985) (plurality opinion) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). As one commentator has noted, however, this test is not very helpful since it essentially says a court must weigh everything. *See* R. Smolla, *supra*, at § 3.03.

Nevertheless, Justice Powell went on to stress that since the credit report at issue there concerned solely "the individual interest of the speaker and its specific business audience," and since the report was made available to only five subscribers who were contractually bound not to disseminate it further, the "speech" in *Dun & Bradstreet* did not involve a matter of public concern. 472 U.S. at 762, 105 S.Ct. at 2947.

In sharp contrast, the report at issue in the case at bar is not a matter solely in the interest of the defendants or their business audience. The nature of the conduct giving rise to Hutton's plea agreement and the identity of those responsible for that conduct were clearly matters of public interest, especially since the banking and securities industries (which have a central role in the American economy) were implicated. Furthermore, the entire controversy received enormous publicity being not only the subject of national news media attention, but also being the subject of congressional hearings. Finally, the Hutton Report was not simply made available to a narrowly defined group but was made widely available through public distribution. Clearly, therefore, defendant Bell is correct in asserting that he disclosed matters of public interest.

■ Defendant is mistaken, however, in contending that a generalized public interest justifies a special privilege for widespread public disclosures. Though Bell has cited numerous decisions upholding a qualified privilege for statements made to pro-

tect the interests of another,[20] none of these cases supports the incredibly broad protection defendant now seeks.

Those courts that had invoked a qualified privilege had found significant policy considerations for doing so. These policies include: physicians' warnings to their patients about other health care professionals, evaluations of employees or those seeking public office, reports of possible misconduct to the appropriate authorities, and even limited disclosures by public officials, about matters the public deserves to know about, made at the request of the news media. In each instance, the protected publication was limited somehow—either by the size of the audience, by the subject matter discussed, or by the depth of detail of the revelations made.

Defendant can point to no limiting factor here. The publication was made widespread without any inquiry or urging on the part of the press. It was not a report of ongoing or previously undisclosed misconduct or criminal wrongdoing. It was not made by a public official attempting to notify the public of something they deserved to know about. The disclosures were not even limited to those matters of greatest public interest—the actions affecting the banking and securities industries. Instead, the report and press conference were in no way circumscribed. They were highly detailed and included discussions of such relatively private matters as recommending what sanctions Hutton should dole out to its employees.

Further, there are no significant policy considerations that would support the sweeping privilege sought by Bell. First, it must be remembered that qualified privileges developed because the common law held defendants strictly liable for defamatory statements. Watkins & Schwartz, *Gertz and the Common Law of Defamation: Of Fault, Nonmedia Defendants, and Constitutional Privileges*, 15 Tex.Tech L.Rev. 823, 825 (1984). Just as the fair comment doctrine developed to protect opinions and thereby promote the free exchange of ideas, the "interest-related" qualified privileges evolved to encourage communication about important matters. *See id.* at 865.

The constitutional fault requirements developed by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, however, have undermined the need for such safety valves. The recent Supreme Court decision in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion) indicates that only in private-figure plaintiff cases *not* involving matters of public concern will a strict liability fault requirement be constitutionally permissible.[21] The question of whether Pearce is a

---

**20.** Among the most relevant of the cases defendant cites are: *Roland v. d'Arazien*, 685 F.2d 653 (D.C.Cir.1982) (for continued efficiency, qualified privilege necessary between speaker and audience when both work in Congressman's office); *Seymour v. A.S. Abell Co.*, 557 F.Supp. 951 (D.Md.1983) (qualified privilege applies to statements informing about violations of law); *Miller v. Lear Siegler, Inc.*, 525 F.Supp. 46 (D.Kan. 1981) (qualified privilege where legal duty to disclose to investors former employee's possible accounting irregularities and effect on financial statements); *Ingber v. Ross*, 479 A.2d 1256 (D.C. 1984) (qualified privilege for dentist to warn patient of incompetent colleague); *Wrenn v. Ohio Dep't of Mental Health and Mental Retardation*, 16 Ohio App.3d 160, 474 N.E.2d 1201 (Ohio Ct.App.1984) (qualified privilege when public official made limited disclosure at request of media to inform public why superintendent of their community's mental health center had been terminated); and *Lagies v. Copley*, 110 Cal.App.3d 958, 168 Cal.Rptr. 368 (Cal.Ct. App.1980) (qualified privilege when newspaper publisher, in primarily responding to investigative reporter's questions about her editorial policies, also had to make some reference to credibility of one of her reporters).

**21.** The Court in *Dun & Bradstreet* admittedly did not decide whether strict liability could be imposed in a defamation action. Technically, only the presumed and punitive damages rules of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) were before the Court. In his concurrence, however, Justice White stated that "it must be that the *Gertz* requirement of some kind of fault on the part of the defendant is ... inapplicable in" private-figure cases not involving matters of public concern. 472 U.S. at 774, 105 S.Ct. at 2953 (White, J., concurring). At least one commentator has reached the same conclusion. *See* R. Smolla, *Law of Defamation* § 3.02[3].

private plaintiff is discussed *infra,* but as was noted earlier in this opinion, the instant case clearly involves matters of public concern. Therefore, since strict liability cannot be imposed, there is a reduced need for the safety valve of a qualified privilege.

Second, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court basically repudiated the short-lived plurality ruling of *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).[22] *Rosenbloom* held that defamatory statements involving matters of public or general interest deserve heightened protection. Though defendant has argued that he does not rely on any protection derived from *Rosenbloom,* the broad qualified privilege he is seeking is, as a practical matter, indistinguishable from the now obsolete *Rosenbloom* theory. Defendant contends that because his statements involved disclosures of public concern, plaintiff should be required to prove malice—exactly what the Court in *Gertz* rejected as being constitutionally required.

While the states may be free to impose their own malice requirement to protect every disclosure bearing on matters of public concern, defendant has not cited any jurisdiction that does so. Such a broad, state-created burden would certainly be at odds with this jurisdiction's policy of providing defamed plaintiffs a maximum standard of protection. *See Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 87 (D.C.1980), *cert. denied,* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981).

Finally, there are policy considerations strongly against creating a qualified privilege in the case at bar. First, society is not served by the dissemination of false infor-

mation. *See Gertz,* 418 U.S. at 340, 94 S.Ct. at 3007 ("there is no constitutional value in false statements of fact."). The public interest in a matter already investigated by Congress and the Department of Justice is not so immediate or critical that a defendant should be protected from his or her negligent publication of falsehoods about another.

Second, there is little likelihood that holding defendants such as Bell liable on a negligence standard will have a chilling effect on speech. Future investigative reports are unlikely to be deterred by such a ruling since they are motivated by a desire for profit.[23] Bell was well paid to publish the Hutton Report. If it can be proven that he negligently published false information about a private individual, there is no reason why he should not be held accountable for any harm caused. A qualified privilege is thus inapplicable to the instant case.

**B. Limited-Purpose Public Figure**

In abandoning the public or general interest approach of *Rosenbloom v. Metromedia, Inc.,* the Supreme Court settled on a compromise approach in *Gertz v. Robert Welch, Inc.* to accommodate the competing values of uninhibited debate with the need to protect reputation. The *Gertz* approach is grounded in a dichotomy between public and private figures. The Court in *Gertz* subdivided its discussion of public figures into two categories: general purpose or universal public figures, and limited or vortex public figures. 418 U.S. 323, 345–46, 94 S.Ct. 2997, 3009–3010, 41 L.Ed.2d 789 (1974).

The former consists of those individuals with such tremendous notoriety that they have sufficient power and influence to

---

22. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 346 (1974) (*Rosenbloom* plurality proposal to extend *New York Times* test would abridge legitimate state interest in enforcing legal remedy for defamatory falsehood of private individual to degree found unacceptable).

  Though *Rosenbloom*'s attempt to provide the substantial protection of the actual malice standard to matters of public interest has clearly been rejected, this does not mean content is an irrelevant concern in defamation actions. The decision in *Dun & Bradstreet* emphasizing con-

tent establishes that. The *Gertz* rule that only actions by public figures are subject to the actual malice burden, however, still stands. Even under *Dun & Bradstreet,* matters of public concern, without more, do not constitutionally merit the protection of the actual malice standard.

23. As the Supreme Court noted in *Dun & Bradstreet,* the desire for profit "is a force less likely to be deterred than others." 472 U.S. at 762, 105 S.Ct. at 2947.

counteract or respond to defamatory statements. *Id.* The latter consists of those thrust to the forefront of particular controversies and who are defamed in connection with those controversies. *Id.* It is the limited-purpose public figure that has produced the greater volume of cases and that involves more problematic judgment calls. *See, e.g., Rosanova v. Playboy Enterprises, Inc.,* 411 F.Supp. 440, 443 (S.D.Ga.1976) ("Defining public figures is much like trying to nail a jellyfish to the wall."), *aff'd,* 580 F.2d 859 (5th Cir.1978).

■ In the instant case, there is no colorable argument that Pearce is a general-purpose public figure. It is Bell's contention, however, that plaintiff is a limited-purpose public figure because his voluntary activities at Hutton drew him into a significant public controversy. This Circuit has adopted a three-part test for determining whether an individual is a limited-purpose public figure. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–98 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).[24] First, the controversy at issue must be isolated "because the scope of the controversy in which the plaintiff involves himself defines the scope of the public personality." *Tavoulareas v. Piro,* 817 F.2d 762, 772 (D.C.Cir.1987) (en banc). Second, the plaintiff's role in the controversy must be examined. *Waldbaum,* 627 F.2d at 1297. Finally, whether the alleged defamation was germane to the plaintiff's participation in the controversy must be determined. *Id.* at 1298.

Applying these tests to the case at hand, it is clear that there was a significant public controversy involving the overdrafting and chaining activities by Hutton. While a public controversy involves more than a public interest,[25] plaintiff has conceded that the plea by Hutton to a 2,000 count indictment did create a public controversy.[26] Nevertheless, plaintiff's participation in the controversy was not such as would make him a limited-purpose public figure.

Pearce's role in the public debate was negligible. Once the original story about the chaining and overdrafting broke in the news, plaintiff had no further involvement in the furor that developed. Furthermore, plaintiff's name never came up until defendant Bell mentioned it prominently in his Report. A new controversy, this time directly involving the plaintiff, was then created in the media. This public controversy, however, would not have arisen but for Bell's statements regarding Pearce. Defendant cannot bootstrap himself into the protection of the actual malice standard by pointing to the controversy over the plaintiff that he himself created by his publication. *Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

In an effort to use the Hutton plea agreement controversy as the basis for Pearce's public-figure status, defendant makes two arguments. First, he has pointed out that the St. Louis and Bethesda branch offices were named in the Information filed against Hutton by the Department of Justice. The fact that plaintiff managed those offices, however, does not mean plaintiff became the focus of attention. Mentioning the name of plaintiff's

---

**24.** It must be remembered, however, that while *Waldbaum* provides useful analytical tools, "the touchstone remains whether an individual has 'assumed [a] role[ ] of especial prominence in the affairs of society … [that] invite[s] attention and comment.'" *Tavoulareas v. Piro,* 817 F.2d 762, 773 (D.C.Cir.1987) (en banc) (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974)).

**25.** The court in *Waldbaum* stated that newsworthiness alone will not suffice to create a public controversy. 627 F.2d at 1296. The controversy must be public in the sense that persons actually were discussing it. *Id.* at 1297. Further, persons beyond the immediate participants

in the dispute must be likely to feel the impact of its resolution. *Id.*

**26.** While conceding the existence of a public controversy, plaintiff argues that the controversy did not exist at the time of his actions. The timing of the controversy, however, is only important with regard to when the alleged defamation occurred—the controversy must precede the defamation. *See Waldbaum,* 627 F.2d at 1297. Plaintiff's arguments regarding when he acted in relation to the controversy go towards his role in the controversy, not its existence.

**1508**

branch office is not the equivalent of broadcasting plaintiff's name. In another context, the D.C. Circuit Court noted that "[b]eing an executive within a prominent and influential company does not by itself make one a [limited-purpose] public figure." *Waldbaum*, 627 F.2d at 1299. Clearly, plaintiff was an anonymous figure until Bell issued his Report.

Nevertheless, defendant's second and main justification for treating Pearce as a limited public figure is that plaintiff voluntarily participated in misconduct leading to Hutton's guilty plea. Bell contends plaintiff had to know such misconduct begged attention. He maintains that the over-drafting and chaining activities were bound to invite scrutiny. By voluntarily engaging in conduct with such foreseeable publicity and which formed the basis for the Hutton plea agreement controversy, plaintiff became a limited-purpose public figure with respect to that controversy prior to Bell's statements.

Obviously, defendant is correct in pointing out that a plaintiff cannot control first amendment standards simply by choosing not to seek publicity. "Those who attempt to affect the result of a particular controversy have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye." *Waldbaum*, 627 F.2d at 1298. Not all public controversies, however, result from activities out of which publicity would foreseeably arise. *See, e.g., Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

Defendant has attempted to analogize this case to a number of decisions including: *Jensen v. Times Mirror Co.*, 634 F.Supp. 304 (D.Conn.1986); *Logan v. District of Columbia*, 447 F.Supp. 1328 (D.D.C.1978); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947 (D.D.C.1976); and *Buchanan v. Associated Press*, 398 F.Supp. 1196 (D.D.C.1975). In each of these cases, however, the plaintiffs had voluntarily participated in activity either patently criminal or already subject to significant public scrutiny.[27] Those plaintiffs had no colorable claim that the coverage by the media was unexpected.

In sharp contrast, plaintiff Pearce argues, as part of his underlying claims, that he did not have reason to know his conduct was improper. In fact, among what Pearce alleges defamed him are Bell's statements about knowing impropriety. Plaintiff's claim that the type of activity he was engaged in is not of a nature that one would immediately recognize as either criminal or highly controversial is quite plausible.[28] Plaintiff worked for a reputable brokerage firm, not the mafia. He was not attempting to embezzle funds from his employer but to maximize its profits. His overly agressive use of "float" simply cannot be equated with blatant criminal conduct, such as the offer to be a "hit man" in *Logan v. District of Columbia, supra.*

Therefore, since plaintiff did not engage in activity for which publicity was clearly foreseeable, since he did not play any role in the controversy once the Hutton plea agreement came to the public's attention, and since he remained virtually anonymous until defendant published his allegedly de-

**27.** In *Jensen*, plaintiff had been a roommate of someone known to be a fugitive from justice. 634 F.Supp. at 311–12. In *Logan*, plaintiff was caught in a sting operation trying to become a "hit man." 447 F.Supp. at 1331. In *Martin Marietta*, plaintiff was a government contractor engaged in extravagantly entertaining military officials—a practice publicly debated for several years, forbidden by Executive Order, and the subject of Congressional hearings. 417 F.Supp. at 950. Finally, in *Buchanan*, plaintiff performed accounting services for the Finance Committee to Re-Elect the President (Nixon) knowing of the intense public interest which

existed at that time in the practices of the Committee. 398 F.Supp. at 1202.

**28.** Of course in ruling on the summary judgment motions, this court might have decided that plaintiff failed to adduce sufficient evidence on this issue to proceed to trial. Such a conclusion, however, would not have been a ruling that plaintiff had to have known he was doing wrong. Absent such a ruling, or other evidence that plaintiff engaged in activity known to be in the limelight, this court cannot conclude that plaintiff risked publicity.

famatory statements, plaintiff cannot be deemed a limited-purpose public figure.

### C. Standard For Compensatory Damages

As noted earlier, *Gertz* set as the critical determination in defamation actions the identity of the plaintiff—i.e., is plaintiff a public or a private figure? In public-figure cases, the plaintiff must satisfy the *New York Times* "actual malice" standard of fault. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As discussed above, the instant case is a private-figure action. Under *Gertz*, in private-figure cases the states are free to set their own standards so long as they do not establish liability without fault. 418 U.S. at 345–46, 94 S.Ct. at 3009–3010.[29] Most states, including the District of Columbia, have thus set the standard of fault at negligence. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 90 (D.C.1980), *cert. denied*, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981).

Plaintiff bears the burden of proving negligence as part of his prima facie case. *See New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26; *Curtiss Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In cases involving the actual malice standard of fault, plaintiff must meet that burden of proof with clear and convincing evidence. *New York Times*, 376 U.S. at 285–86, 84 S.Ct. at 728–29. The assumption is, however, that in cases involving the negligence standard of fault, plaintiff must meet the burden of proof by only a preponderance of the evidence. *See Gertz*, 418 U.S. at 366, 94 S.Ct. at 3020 (Brennan, J., dissenting) ("in contrast to proof by clear and convincing evidence required under the *New York Times* test, the burden of proof for reason-

able care will doubtless be the preponderance of the evidence."); *see also* R. Smolla, *Law of Defamation* § 3.08.

Concluding that plaintiff must prove negligence by a preponderance of evidence does not end the matter, however. Defendant contends that a "professional malpractice" model of negligence must be adopted. Defendant's position is that plaintiff must establish what the professional standard of care is, and that Bell deviated from that standard. To set the standard of care, plaintiff must provide expert testimony.

The *Restatement (Second) of Torts* has adopted the professional model of negligence for defamation actions involving a media defendant. *See* Restatement (Second) of Torts § 580B comment g, at 228 (1977). Presumably, the *Restatement (Second)*, and any jurisdictions following it, would revert to an ordinary reasonable person standard when the defendant is not part of the media. *See* R. Smolla, *supra*, at § 3.25[1]. While defining who is a member of the media may present difficulties in some situations, it is clear that defendant Bell is not part of a news organization. Therefore, even under the *Restatement (Second)*, the "professional malpractice" model is inapplicable to the facts of the instant case.

Furthermore, many jurisdictions have eschewed the *Restatement (Second)* approach and have simply adopted the traditional tort "ordinary reasonable person" standard. R. Smolla, *supra*, at § 3.26. This court also adopts the "ordinary reasonable person" model of negligence. Though defendant has pointed out that this action involves some exceedingly complicated matters, the complexity refers to the financial transactions involved. A professional malpractice negligence model is only justified when the field involved cannot be

---

29. *Gertz* was modified slightly in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion). There the Supreme Court provided that a lesser standard than actual malice is permissible for presumed and punitive damages in private-figure cases not involving matters of public concern. 472 U.S. at 760–61, 105

S.Ct. at 2946–47. The decision strongly suggests that the *Gertz* bar to strict liability is inapplicable to private-figure cases not involving matters of public concern. The issue need not be resolved here, however, because as noted earlier in this opinion the instant case *does* involve a matter of public concern. Therefore, the standard of fault is negligence.

understood without resort to technical expert testimony. *Id.* Taking reasonable precautions to ensure the accuracy of an investigative report is simply not something beyond the comprehension of a layman. Expert testimony is not required in the instant case.

The court notes that negligence in the context of an investigative report may include:

(1) failure to pursue further investigation;

(2) unreasonable reliance on sources;

(3) unreasonable formulation of conclusions, inferences, or interpretations;

(4) errors in note-taking and quotation of sources;

(5) misuse of legal terminology;

(6) mechanical or typographical errors;

(7) unreasonable screening or checking procedures;

(8) the failure to follow established internal practices and policies.

*See* R. Smolla, *Law of Defamation* § 3.28[3].

### D. Standard For Punitive Damages

In *Gertz,* the Supreme Court held that punitive damages can be recovered only upon a showing of actual malice. 418 U.S. at 349, 94 S.Ct. at 3011. For a time, there was debate over whether *Gertz* was only meant to apply to media defendants since there is some language in the opinion suggesting this. *See* R. Smolla, *supra,* at § 3.02[2]; Note, *Private Individual May Recover Presumed and Punitive Damages Without a Showing of Actual Malice,* 16 Seton Hall L.Rev. 785, 795 (1986). The D.C. Circuit has held, however, that the actual malice standard governs even in cases involving nonmedia speakers. *Davis v. Schuchat,* 510 F.2d 731, 734 n. 3 (D.C. Cir.1975).

The issue appears resolved in any event. In *Dun & Bradstreet,* a lower court had ruled that on the issue of presumed and punitive damages, *Gertz* did not apply because the defendant was a nonmedia speaker. 472 U.S. at 753, 105 S.Ct. at 2942. Though the Supreme Court affirmed the decision, it did so for different reasons. Apparently rejecting the lower court's invocation of the media/nonmedia distinction,[30] the Court basically ruled that in private-figure cases not involving matters of public concern, *Gertz* does not apply. *Id.* at 760–61, 105 S.Ct. at 2946–47. In such cases, the availability of punitive damages is purely a matter of state law.

■ Plaintiff has attempted to latch onto the *Dun & Bradstreet* holding to argue that punitive damages are available here without a showing of actual malice. His position is that because Mr. Bell is not a member of the news media, and because his Report dealt with financial practices, the defamatory statements were merely commercial speech. As the Court in *Dun & Bradstreet* recognized, such speech "occupies a 'subordinate position in the scale of First Amendment values.'" 472 U.S. at 758 n. 5, 105 S.Ct. at 2945 n. 5 (citations omitted). Plaintiff's argument, however, is untenable. The Hutton Report cannot be considered commercial speech simply because its author was not a journalist and its subject concerned finance.

■ As discussed previously, the Hutton Report clearly involved matters of public concern. Therefore, *Dun & Bradstreet* is wholly inapplicable. *Gertz* governs this issue. To recover punitive damages, plaintiff must prove actual malice by clear and convincing evidence. *See Davis v. Schuchat,* 510 F.2d at 738; *Afro-American Publishing Co. v. Jaffe,* 366 F.2d at 661; *see also New York Times Co. v. Sullivan,* 376 U.S. at 285–86, 84 S.Ct. at 778–29 (actual malice must be proved with "convincing clarity").

---

**30.** In *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Court indicated that the media/nonmedia distinction may not be quite dead yet. In *Hepps,* the Court specifically refused to consider how it would have ruled had the defendant not been part of the media. 106 S.Ct. at 1565 n. 4. *Hepps,* however, was dealing with the issue of falsity. *Dun & Bradstreet* remains the Court's most recent pronouncement regarding the issue of fault, and in that context, the media/nonmedia distinction has not been made a consideration.

Actual malice is defined as publishing a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court explained the standard further by stating that:

> reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

390 U.S. at 731, 88 S.Ct. at 1375. Thus the actual malice standard is a subjective one and is very difficult to meet. Whether actual malice exists must be determined on a case-by-case basis, *id.* at 730–31, 88 S.Ct. at 1325–26, but it is clear the focus is on the publisher's subjective attitude toward the truth or falsity of his or her statements.

### E. Falsity

■ In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Supreme Court held that the plaintiff bears the burden of proving that allegedly defamatory statements are false when the publication involves a matter of public concern and the action is against a media defendant. 106 S.Ct. at 1564. The Court, however, expressly refused to consider what standards would apply in an action against a nonmedia defendant. *Id.* 106 S.Ct. at 1565 n. 4. Since the case at bar clearly involves a nonmedia defendant, there is no binding authority on this issue.[31]

Nevertheless, this court holds that plaintiff must bear the burden of proving the falsity of allegedly defamatory statements when the speech involves matters of public concern. As previously discussed, the Court in *Dun & Bradstreet* indicated that whenever matters of public concern are debated, first amendment interests in the free exchange of ideas come into play. In *Hepps*, the Court ruled that such constitutional interests require plaintiffs to bear the burden of showing falsity because of the danger that if the burden were on defendants, liability might be imposed even though a publication was true. 106 S.Ct. at 1563–64. This could occur because some statements cannot be proven true or false. *Id.*

Though the opinion in *Hepps* made the rather confusing reference to the media/nonmedia distinction, especially in light of the seeming abandonment of the concept in *Dun & Bradstreet*, the Court hinged its decision primarily on the fact that the speech at issue was of public concern. For example, the opinion stated that:

> two forces ... may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern.

106 S.Ct. at 1563. Notably absent from those "two forces" was any reference to whether the defendant was a member of the media.

Since the instant case involves matters of public concern, plaintiff bears the burden of proving the falsity of defendant's statements. There appears to be no reason for distinguishing this case from *Hepps* simply because defendant Bell is not part of the news media. Furthermore, imposing the burden of proof on plaintiffs is implicitly required by *Gertz. See* B. Sanford, *Libel and Privacy: The Prevention and Defense of Litigation*, § 6.3.2 & n. 71 (and cases cited therein); *see also* R. Smolla, *Law of Defamation* § 5.05; Franklin & Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity*, 25 Wm. & Mary L.Rev. 825, 855–58 (1984). A constitutional requirement that a plaintiff must prove a defendant either knowingly, recklessly, or negligently published a false

---

**31.** In *Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir. 1987) (en banc), this Circuit noted that plaintiff bears the burden of proving falsity. 817 F.2d at 775–76, 783. *Tavoulareas*, however, involved a media defendant. In fact, the court there specifically relied on the *Hepps* decision.

statement, seems to necessarily require the prior or simultaneous determination that the statement is false.

■ Having determined that plaintiff Pearce must prove the falsity of Bell's statements, the court now turns to the quantity of proof that plaintiff must produce. The Court in *Hepps* specifically refused to consider this issue, so this court is again left without guidance. 106 S.Ct. at 1565 n. 4. In public-figure cases, a number of courts have held that plaintiff must provide clear and convincing evidence.[32] Given that clear and convincing is also the evidentiary standard for proving fault in such cases, the requirement is not only logical but is also not unduly burdensome.

In private-figure cases, however, the state interest in protecting reputations rises. *Gertz,* 418 U.S. at 341–46, 94 S.Ct. at 3007–3010. Thus a private plaintiff need only prove negligence as the level of fault—and only by a preponderance of the evidence. It is thus not only logical to impose the very same evidentiary standard on the issue of falsity, it is prudent to do so to avoid confusing a jury. Defamation actions are often complex enough without also instructing a jury that plaintiff may prove negligence by a mere preponderance of the evidence but must establish falsity by clear and convincing evidence.

Admittedly, there is a credible argument that in the interest of protecting truthful speech, a plaintiff should be required to convincingly establish the challenged statement is false. Otherwise, an undeserving plaintiff might prevail in a case simply by creating sufficient doubt in the jurors' minds as to the truth of the publication. Nevertheless, a special and higher burden over the traditional preponderance of the evidence standard should not be imposed lightly. The proportionality of a preponderance standard for both falsity and fault issues should be maintained. Furthermore, by placing the burden of proof on plaintiffs originally, defendants already possess a substantial advantage. This built-in protection was precisely the point made by the Court in *Hepps*. To also impose a clear and convincing evidentiary standard seems unduly burdensome on the private-figure plaintiff. Therefore, plaintiff Pearce need only prove the falsity of Bell's statements by a preponderance of the evidence.

Finally, the court notes that with regard to establishing falsity, slight inaccuracies in an allegedly defamatory statement must be tolerated. The test is whether the statement is "true in substance." *See* Restatement (Second) of Torts § 581A comment f, at 237 (1977); *see also* R. Smolla, *Law of Defamation* § 5.08 n. 48 (cases cited therein). The key is that the "gist" or "sting" of the statement cannot be justified. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* § 116, at 842 (1984). As one commentator has noted, summary judgment "is often granted to defendants on the issue of substantial truth." B. Sanford, *Libel and Privacy: The Prevention and Defense of Litigation* § 6.4.1.

## IV. SUFFICIENCY OF PLAINTIFF'S EVIDENCE

In a pair of recent decisions, the Supreme Court considered the standards to be applied when reviewing the sufficiency of a party's evidence in a motion for summary judgment. In *Celotex Corp. v. Catrett,* the Court held that summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

In the case at bar, it has been determined that to collect compensatory damages, plaintiff bears the burden of proving (1) that defendant's statements about plaintiff were false, and (2) that defendant was negligent in publishing them. Unless plaintiff can establish both of these essential elements by sufficient evidence, there can be

---

**32.** *See Tavoulareas v. Piro,* 817 F.2d at 776; *see also* R. Smolla, *Law of Defamation* § 5.06 n. 44 (cases cited therein).

no genuine issue as to any material fact. *Celotex,* 106 S.Ct. at 2553. Assuming plaintiff is entitled to compensatory damages, to collect punitive damages plaintiff bears the additional burden of proving that defendant published his statements with actual malice.

In *Anderson v. Liberty Lobby, Inc.,* a decision involving a summary judgment motion in a libel case, the Supreme Court held that in assessing whether a party has sufficient evidence to meet its burden of proof, "the judge must view the evidence presented through the prism of the substantive evidentiary burden." 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Of course the judge is not to usurp the role of the jury by determining whether the evidence unmistakably favors one side or the other. *Id.* 106 S.Ct. at 2512. Instead, the judge's inquiry asks, based on the evidentiary standard to be used at trial, whether reasonable jurors could find for the plaintiff—" 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.' " *Id.* (citations omitted).

As discussed earlier in this opinion, the evidentiary standard for compensatory damages is the traditional preponderance of the evidence. That is, for plaintiff's compensatory damages claim to survive summary judgment, plaintiff must have adduced such evidence that a jury could reasonably conclude the preponderance of the evidence established Bell's statements as false and as negligently published.

As to punitive damages, the evidentiary standard is clear and convincing. For plaintiff's punitive damages claim to survive, not only must the compensatory damages claim survive, but plaintiff must have adduced enough evidence for a jury to be able to reasonably conclude that plaintiff clearly and convincingly proved Bell published his statements with actual malice.

### A. Compensatory Damages

To determine what supporting evidence Pearce has, his allegations must first be specified. As to the compensatory damages claim, the charges of negligence and falsity basically fall into three categories. First, the Hutton Report concluded that while some of the company's upper management were responsible for failing to detect and stop the financial abuses leading to the plea agreement, it was actually just a few low level personnel who created and/or actively engaged in the disputed practices. Pearce contends this conclusion is false, and that it gives the public a negative impression about him since the Report includes plaintiff among those low level employees blamed for the improprieties.

Second, Pearce charges that Bell defamed him with regard to the chaining activity. While Pearce does not refute his participation in the practice, he alleges that Bell falsely asserted chaining was "a deviation from Hutton's normal drawdown structure." Complaint at ¶ 21(a). Plaintiff also claims Bell falsely stated that Pearce was responsible for creating the "St. Louis/Bethesda/Seattle Chain" and that this was "the only chain identified that was initiated and administered at the branch and not the regional level." Complaint at ¶¶ 21(b), 21(c).

Third, Pearce charges that Bell defamed him with regard to the overdrafting activity. Pearce claims Bell falsely stated that plaintiff "actually engaged in wrongdoing" —that he was involved in criminal conduct. Complaint at ¶¶ 21(e), 29. Further, he alleges Bell falsely stated plaintiff was a "moving force in improprieties." Complaint at ¶ 21(f). Finally, he asserts that Bell falsely claimed plaintiff's overdrafting activity was "so aggressive and egregious as to warrant sanctions" since "no reasonable person could have believed this conduct was proper." Complaint at ¶¶ 21(g), 21(d).

In support of his allegations, plaintiff's counsel has presented this court with an enormous amount of material—the bulk of which is a mass of useless, repetitious argument and hyperbole often based solely on plaintiff' own affidavit. Even after this court made several futile requests at the hearing on these motions, counsel still failed to lucidly specify what plaintiff is

claiming and what factual support there is for each claim. The court has been forced to sift through the record and organize the relevant material on its own.

Boiled down, the evidence supporting plaintiff's case can be grouped under three headings. First, is that evidence supporting the contention that Hutton's upper management initiated or at least knew about the improper practices. Second, is that evidence supporting the contention that Pearce reasonably believed his conduct was proper. Third, is that evidence supporting the contention that Bell's investigation was inadequate to reach the conclusions made.

*1) Evidence that upper management knew about the abuses*

■ Support for the contention that upper management initiated or knew about the chaining and overdrafting can be seen in several Hutton memos. For example, there is a reminder to branch cashiers to drawdown more than the formula (that is, the "official" calculation of Hutton's Cash Management System) "but not less!" PLAINTIFF'S SUMMARY JUDGMENT EXHIBIT [hereinafter EXH.] 31. In another memo, managers whose offices engaged in overdrafting were advised not to have their banks provide them account analyses. EXH. 40. In a letter from Norman Epstein, Head of Operations, to George Ball, President of Hutton, proposed Canadian operations were rejected because it was noted that Hutton's "system of overdrafting is not available in the Canadian Markets." EXH. 30. There is also a memo from Tom Lillis, Vice President of Accounting Services, to George Ball that responds to an inquiry Ball made about the interest income of two branches. In that memo, Lillis explicitly states that most of the income in both offices was due to substantial overdrafting. EXH. 33.

Further evidence of upper management's culpability comes from the fact that it apparently would not have been possible for Pearce to hide his conduct. To engage in chaining, upper management would have had to stop drawing down the St. Louis branch office customer deposits and instead draw down those funds from the remote branch in that particular chain—i.e., Bethesda. The system could not work by Pearce secretly arranging for Bethesda to draw down St. Louis. Furthermore, Pearce kept daily logs that note a conversation with Thomas Morely, Money Mobilizer, in which Morely suggested that St. Louis be drawn down by a branch further west than Kansas City (the St. Louis office's proper regional drawdown point). EXH. 43. The log also records a subsequent conversation with Michael Wallace, Regional Operations Officer, in which Wallace approved the drawdown of St. Louis by Bethesda.[33] *Id.*

To engage in overdrafting, Pearce had to use "branch reimbursement checks" (BRC's). All BRC's were furnished by Hutton's national cash management authorities. Since BRC's covered the amount any account deficit created by an overdraft, these authorities had to have known Pearce was repeatedly making large overdrafts. Additionally, the regional offices and the national headquarters were furnished with monthly statements of account, account analyses, details of customer deposits, and daily statements of bank account balances. *See, e.g.,* EXH. 47. Despite all this information being available, it appears undisput-

---

**33.** The Hutton Report did note this conversation and that Mr. Wallace denied it occurred. Furthermore, a government investigator who interviewed plaintiff in connection with the Justice Department investigation, recorded Pearce as explicitly denying having talked to Mike Wallace about the St. Louis/Bethesda drawdown. PARTIAL REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT BELL'S MOTIONS FOR SUMMARY JUDGMENT, exhibit 1, at 3. Nevertheless, it would seem that someone at the regional level had to have approved the St. Louis/Bethesda chain because it necessitated the discontinuance of the St. Louis drawdown by Mr. Wallace's own Kansas City office. There is nothing in the record to indicate how or even whether Bell resolved the discrepancy between Pearce and Wallace's stories. At trial, Pearce will certainly have to explain the government investigator's notation about this issue. Given that both sides have some documentation supporting their position, however, the court cannot decide at this stage whose story is to be believed.

ed that Pearce was never warned about making excessive overdrafts.[34]

Further support for the theory that upper management was aware of the abuses because of the readily available financial data can be seen in a memo from John Latshaw, a Hutton director, to Robert Foman, Chairman and Chief Executive Officer of Hutton and Hutton Group. EXH. 39. Latshaw excoriated New York management for failing to make sure the practices they advocated were legal. In fact, Latshaw stated that the disputed conduct "originated and was strongly sponsored by our president and other management in N.Y."

Even Joel Miller, engagement partner for Hutton's independent auditors, Arthur Anderson & Co., stated in his deposition that the overdrafting was certainly known by "the people who manage the accounts reconciliation department" and by the "people who prepare the financial statements." EXH. 23, at 78. Based on all these facts, there is a genuine issue as to whether Bell's conclusion that management was not affirmatively involved in the fraudulent practices is false.

### 2) *Evidence plaintiff reasonably believed his conduct was proper*

■ Support for the contention that Pearce reasonably believed his conduct was proper comes from several sources. As to the practice of chaining, Pearce points to the alleged conversations with Mr. Morely and Mr. Wallace where those superiors instructed him to find another drawdown point for his branch, and then later gave approval for Bethesda being that point. *See* EXH. 43.

These conversations not only address how Pearce could have believed chaining was proper, they also tend to contradict Bell's claim that plaintiff was responsible for creating the "only chain identified that

was initiated and administered at the branch and not at the regional level." Bell's statement that plaintiff created the "St. Louis/Bethesda/Seattle Chain" is equally undercut. Furthermore, a jury might find that latter statement substantially false regardless of whether they conclude Pearce created the St. Louis/Bethesda drawdown. This is because Pearce had no incentive to create a Bethesda/Seattle chain. Bell admitted this fact himself in his deposition. EXH. 5, at 310.

Plaintiff has other evidence regarding chaining. To refute Bell's assertion that the practice was "a deviation from Hutton's normal drawdown structure," plaintiff has pointed to the descriptions of the numerous chains uncovered by the Justice Department investigation. EXH. 41. While defendant has pointed out that plaintiff's counsel has referred to chaining as a deviation from normal, plaintiff has responded by contending counsel's references were merely a poor choice of words. The term "normal" was purportedly used by counsel to refer to what was normal to the financial world, not what was normal for Hutton. Thus, whether chaining was a deviation remains an issue for trial.

As to the practice of overdrafting, plaintiff first points to the evidence of how upper management pushed aggressive overdrafting. Examples of such evidence include:

—Note by Thomas Lynch, Chief Financial Officer, attached to a memo describing how overdrafts should be calculated, stating "if I were a manager I would *double* the estimate." EXH. 24.

—Memo reminding personnel to "drawdown more than formula but not less!" EXH. 31.

—Branch office procedures manual stating "It behooves a manager to overdraft as much as possible" since he or

---

**34.** Defendant argues that plaintiff cannot point to any specific person in upper management who received knowledge of the overdrafting. Plaintiff, however, has not alleged that any particular officer knew about this practice. Instead, his position is simply that it is false to say senior management was unaware of this activi-

ty. Given the data available to Hutton's national level, the evidence adduced is sufficient for a jury to reasonably accept plaintiff's position. At trial, of course, defendant may be able to establish why the available data did not put upper management on notice.

she will earn money by doing so and possibly be charged interest for failing to do so. EXH. 35.

—Regional planning meeting at which Richard Genin, Senior Vice President for Trading Operations, passed out sealed envelopes containing play money to drive home the point about the benefits to be reaped from interest earnings. Hutton Report, at 89.

Defendant has not attempted to argue that Hutton management did not aggressively push managers for higher interest earnings. Even Bell recognized in his report that Hutton had an "overdraft culture." Hutton Report, at 95. Furthermore, it was upper management that developed the overdrafting system. Though a complicated formula was devised to purportedly guide managers as to how much to overdraft, there was no real limit under the system. In fact, some memos indicate the formula was meant to establish a minimum overdraft, not a maximum. Despite providing upper management with substantial, regular information as to what they were doing, it appears that no branch manager (and certainly not plaintiff) was ever reprimanded for overdrafting too much. The reasonableness of the branch manager's efforts given this apparent green light from their supervisors was stressed by Hutton director John Latshaw in a memo to Chairman Robert Foman. *See* EXH. 39. How Bell determined there was excessive overdrafting under these circumstances has not been explained and thus remains an issue for trial.

Bell himself noted during the press conference that overdrafting methods were spread among managers by word of mouth. EXH. 7, at 22–23. Furthermore, practical realities have to be considered by the court as well. As a large prosperous firm, Hut-

ton always had the means to pay any of the overdrafts. It would not have been unreasonable for branch managers to have perceived a difference between overdrafting a personal account and overdrafting the account of a huge brokerage firm. In fact, the engagement partner for the independent auditor and Hutton's general counsel had concluded overdrafting was a permissible practice. EXH. 46. Lastly, it must be noted that Pearce did not abuse overdrafting to such an extent that his branch office bank, Boatmen's National Bank of St. Louis, lost profitability on the account. EXH. 44, at 3. Given all of the above, there is a genuine issue as to whether plaintiff knew his conduct was wrong.[35]

### 3) Evidence of inadequate investigation

Support for the contention that Bell's investigation was inadequate also comes from a variety of sources. First, there is some indication that Bell unnecessarily rushed his report to publication. Peter Driscoll, the Hutton paid attorney assigned to represent Pearce during the Bell investigation, has testified that he observed how pressured the investigators were prior to completing the Hutton Report. EXH. 13, at 81–82, 87, 91. That situation was unnecessary because the publication date was picked by Bell. Hutton Chairman Robert Foman had told Bell to proceed expeditiously but to nevertheless "take as long as is required thoroughly to complete your investigation." EXH. 8.

The apparent rush to complete the report may have caused or at least exacerbated a second alleged problem with the investigation—a failure to obtain and review many of the relevant documents. Despite having been retained to uncover who was responsible for the conduct that gave rise to the plea agreement, Bell failed to obtain many

---

**35.** In an effort to firmly establish that Pearce knew he was doing wrong, defendant has pointed to a statement made by a government investigator in a memorandum about plaintiff's interview during the Justice Department investigation. PARTIAL REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT BELL'S MOTIONS FOR SUMMARY JUDGMENT, exhibit 1, at 6. In that memorandum, the investigator reported Pearce as saying that the amount he was over-

drafting "wouldn't be noticed probably by the bank or by the company." Pearce, however, has not admitted making such a statement. Furthermore, the investigator's notation is rather cryptic since the rest of the report of the interview makes repeated reference to Pearce's denial that he knew the practice was wrong. In this context, the investigator's memorandum cannot be deemed dispositive on the issue of whether plaintiff knew his actions were improper.

of the documents the Justice Department based its prosecution on. Hutton Report, at 7, 46. A limited number of such documents were eventually made available but only a few days before the report was issued. *Id.* Furthermore, an additional sixty-nine branches were identified as possibly engaging in excessive overdrafting but were exonerated because of the unavailability of documentation. *Id.* at 72. Given the fact that Bell had to rely entirely on information supplied by the management he was investigating, such a restriction in available evidence certainly raises questions as to the reasonableness of his conclusions.

There are still other problems with Bell's investigation. Bell's responses during his deposition indicate he may have failed to gain a good understanding of the practices he reported on. For example, Bell admitted he did not know:

—How interest was generated or allocated by overdrafts. EXH. 5, at 147.

—That customer deposit records and daily bank opening and closing balances were communicated to New York. *Id.* at 182, 185.

—The details of how money was moved from branch to headquarters. *Id.* at 185.

—Whether the controller would prepare or approve the company's balance sheets (important because the identification of drafts payable exceeding assets would indicate overdrafting). *Id.* at 192.

—Why it was concluded that $30,000 in interest for one month was a fair standard for judging which branches may have engaged in excessive overdrafting. *Id.* at 247.

—How drawdowns were calculated, or the individuals and organizational elements participating in a drawdown. *Id.* at 56.

Bell also appears to have limited his investigation to the practices occurring between 1980 and 1982. It is possible, however, that research into chaining and overdrafting conducted before and after that period would have uncovered evidence that senior officers were responsible for the practices.[36] Finally, Bell did not give plaintiff a chance to procure from the banks he dealt with, confirmation that they had received adequate compensation. Such confirmation apparently relieved another branch manager, Bill Wilcox, from being blamed for the fraudulent conduct. EXH. 45. Given all the above, there is clearly a genuine issue as to whether Bell's investigation can support his conclusions.

Based on the preceding discussion, this court must conclude that plaintiff has adduced sufficient support for his compensatory damages claim to survive defendant's motions for summary judgment. Under a preponderance of the evidence standard, and viewing the evidence in favor of plaintiff, it cannot be said that as a matter of law it would be unreasonable for a jury to conclude that Bell's statements, regarding upper management's role in the improprieties and plaintiff's culpability in chaining and overdrafting, were false. Furthermore, using the same evidentiary standard it would not be unreasonable for a jury to conclude Bell negligently published those statements. Therefore, defendant's motion for summary judgment on the compensatory damages claim is denied.

### B. Punitive Damages

As to the claim for punitive damages, plaintiff alleges that Bell published his statements with actual malice. As noted earlier in this opinion, actual malice is a very difficult test to meet. It is a subjective test requiring proof "that the defendant either knew the statement to be false or that the defendant 'in fact entertained serious doubts as to the truth of his publication.'" *Tavoulareas v. Piro*, 817 F.2d at

---

**36.** Plaintiff's additional criticism of Bell for failing to investigate practices besides chaining and overdrafting is specious. Bell was only hired to report about the conduct leading to the plea agreement. While additional information bearing on that conduct might have been found had research been extended to times before and after the period of the Justice Department investigation (i.e., 1980–82), there would have been nothing to gain from expanding the investigation to practices unrelated to chaining or overdrafting.

776 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)); *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 1567, 89 L.Ed.2d 783 (1986) (Stevens, J., dissenting) ("For [the actual malice] standard to be met, the publisher must come close to wilfully blinding itself to the falsity of its utterance.").

Plaintiff has adduced little evidence to support such a claim. He relies primarily on the fact that Bell received a very large fee for three months work. *Tavoulareas*, however, compels rejection of attempts to stretch inferences from underlying facts in the kind of unsupported manner plaintiff seeks here. *See* 817 F.2d at 796 ("pressure to produce [stories of wrongdoing] cannot as a matter of law, constitute evidence of actual malice."). A large fee does not establish a cover-up or scapegoating attempt.

Plaintiff also points to the apparently narrow scope of the investigation and the rush to publish the report as evidence of malice. *Tavoulareas* compels rejection of these inferences as well. To constitute evidence of malice, plaintiff would have to have shown haste *"without regard for accuracy."* 817 F.2d at 796 n. 49. As other evidence of malice, plaintiff cites to a number of instances in the Hutton Report where low level personnel claimed to have received upper management approval. These senior officers are then reported to have denied giving approval. No resolutions of the discrepancies are made, except that Bell apparently wound up accepting upper management's stories since they are the ones absolved of affirmative wrongdoing. Again, however, such action does not create a justifiable inference that Bell wilfully blinded himself to the alleged falsity of his statements.

The only other support plaintiff can muster are the claims that Chairman Robert Foman was questioned by Bell only socially (something defendant vehemently denies with cites to Foman's deposition), that the most senior officers to receive any significant criticism (Messrs. Lynch and Rae) were close to retirement anyway, that Bell came to the same conclusion about the limited extent of the fraudulent practices at Hutton that Foman made on the day the plea agreement was announced, and that Bell unnecessarily held a press conference in Washington to seek maximum publicity for his conclusions. Even accepting all these claims as true, and viewing them in totality with the rest of the points raised by plaintiff, it is clear that as a matter of law it would be unreasonable for a jury to rule in favor of plaintiff.

There is insufficient support in the record, even under a mere preponderance of the evidence standard, to prove that Bell published the Hutton Report knowing it was false or with reckless disregard for its truth or falsity. Moreover, a mere preponderance would not have been enough to sustain this claim. Plaintiff bears the much more demanding burden of proving actual malice clearly and convincingly. Obviously, plaintiff has failed to do so. Therefore, summary judgment must be granted against plaintiff's punitive damages claim.

This decision is bolstered by the fact that it is not unusual in defamation actions to dismiss claims for punitive damages while retaining compensatory damages claims that are based on negligence. *See Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 90 (D.C.1980) (evidence completely failed to meet *Times* [actual malice] standard so summary judgment granted as to punitive damages but denied as to actual damages judged under negligence standard), *cert. denied*, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981).

The policy rationale for this situation is based on the reason for the actual malice standard. First amendment rights to free speech must not be unduly burdened. Since punitive damages are akin to criminal sanctions and may have little relation to any actual harm suffered, they can have a tremendous chilling effect on speech. To be eligible for such damages, plaintiffs must overcome very substantial hurdles. In the case at bar, plaintiff has failed to meet the test. As to punitive damages,

therefore, defendant's motions for summary judgment are granted.

An appropriate Order accompanies this Memorandum Opinion.

### ORDER

This matter came before the court upon defendant Griffin B. Bell's motions for partial summary judgment and for summary judgment. After hearing oral argument on these motions on March 9, 1987, and after considering the underlying papers, plaintiff's oppositions, and the entire record in this case, it is, by the court, this 14th day of July, 1987,

ORDERED that, for the reasons stated in the accompanying Memorandum Opinion, defendant's motion for partial summary judgment is granted; and it is further

ORDERED, ADJUDGED, and DECREED that judgment is hereby entered against plaintiff's false light invasion of privacy claim and against plaintiff's punitive damages claim; and it is further

ORDERED that, for the reasons stated in the accompanying Memorandum Opinion, defendant's motion for summary judgment is granted in part and denied in part; and it is further

ORDERED, ADJUGED, and DECREED that judgment is hereby entered against plaintiff's claim for misappropriation of name; and it is further

ORDERED that plaintiff's only remaining claim in this action is for compensatory damages based on the charge of defamation.