WRENN, APPELLANT, *v.* OHIO DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION ET AL., APPELLEES.

(No. 83AP-554—Decided March 1, 1984.)

*Mr. Mohamed Y. Shousher* and *Mr. Norman A. Abood,* for appellant.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, and *Mr. Mark T. D'Alessandro,* for appellee.

McCORMAC, P.J. Plaintiff-appellant, Curtis Wrenn, commenced an action in the Court of Claims of Ohio against defendant-appellee, Ohio Department of Mental Health and Mental Retardation, charging the state with libel as a result of statements made to a local newspaper regarding his termination from his position as Superintendent of Toledo Mental Health Center (hereinafter "TMHC"). Following a trial to the court, the court rendered judgment for defendant, from which plaintiff has appealed, asserting the following assignments of error:

"I. The Court of Claims erred in holding that the appellees were absolutely privileged in the statements that they made to the press and further holding that the appellees' actions did not amount to libel.

"II. The Court of Claims erred in refusing to remove the attorney general as counsel for the state of Ohio in the state Court of Claims.

"III. The Court of Claims erred in

holding that appellee was not acting outside the scope of his employment in giving the statements to the Toledo Blade.

"IV. The court erred in refusing to allow appellant's exhibit 11 into evidence at the trial of this action.

"V. The decision and opinion of the Court of Claims of Ohio is against the manifest weight of the evidence."

Plaintiff was hired as Superintendent of TMHC on December 16, 1979, and was relieved of his duties on December 16, 1980. The Toledo Blade printed articles on December 17 and December 19, 1980, quoting employees of the Ohio Department of Mental Health and Mental Retardation (hereinafter "department") as saying that plaintiff was terminated for several reasons, the main reason of which was a high ratio of overtime hours in comparison to other department institutions. Specifically, the December 17 article quoted Al Dopking, director of public relations for the department at that time, who stated that plaintiff was terminated for the high overtime situation. Donald Widmann, commissioner of the department, told the Blade that plaintiff was terminated for a number of reasons connected with his managerial performance, including the overtime situation. These statements were printed in the December 19 issue.

Following his termination, plaintiff claims that the locks on his office were changed, preventing him from removing his personal belongings without making arrangements for access with the acting superintendent, implying that he was suspected of dishonest behavior. Plaintiff argues that this treatment and the statements made about him to the press defamed him, resulting in his inability to obtain employment as a hospital administrator elsewhere. However, since plaintiff's suit attacks only the Blade articles, and those articles made no mention of any changed locks, that issue is not involved in this appeal.

At trial, plaintiff maintained that Widmann and Dopking violated department rules by releasing information to the Blade concerning his termination. In addition, plaintiff argued that Widmann acted maliciously in releasing the information without checking the truth or falsity of the overtime situation. Plaintiff claimed that TMHC did not have the highest overtime ratio and introduced evidence of other measures taken by him, which he said resulted in considerable savings to the department. He also claimed that he had never received complaints about his work nor received any warnings that his job might be in jeopardy.

In response, defendant offered testimony of department employees who questioned plaintiff's figures on money saved, as well as testimony from several department sources, indicating that there were numerous complaints about ongoing problems with the relationship between TMHC and the other mental health centers in the community, an important liaison system to be overseen by plaintiff. The trial court found that the statements made by department employees were absolutely privileged and, in the alternative, that the statements were not defamatory and that plaintiff failed to prove the existence of actual malice.

The first and fifth assignments of error will be combined for discussion as they are interrelated and directed to the central issue, which is whether plaintiff was defamed by the statements made to the Blade as well as whether those making the statements were protected by a privilege, either absolute or qualified.

The Court of Claims found that the statements made by Widmann and Dopking to the Blade were absolutely privileged; plaintiff assigns this finding as error. If a communication is absolutely privileged, it is a bar to an action for libel or slander. It matters not that the statement made was known to be false

and was, therefore, made in bad faith, or even maliciously. The publisher is protected because it is felt that the public interest is greater in having public affairs freely and openly conducted. *Shade* v. *Bowers* (1962), 93 Ohio Law Abs. 463. However, since an absolute privilege produces such profound results, it is quite limited in scope. *Costanzo* v. *Gaul* (1980), 62 Ohio St. 2d 106 [16 O.O.3d 134]. Specifically, absolute privilege extends to "* * * legislative and judicial proceedings, and other acts of state, such as communications made in the discharge of a duty of the Governor and heads of the executive departments of a state." *Id.* at 109. As noted further by the court:

"We believe that the rule of absolute privilege may reasonably be applied to utterances made during the course of official proceedings by members of local governing bodies, at least where the statements relate to a matter under consideration, discussion or debate." *Id.* at 110.

Thus, a key factor is whether the statements were made while in the discharge of an official duty. Even if it could be found that Widmann and Dopking fell within the class of state executive officials entitled, under the proper circumstances, to an absolute privilege, a tenuous conclusion in itself, the statements made to the Blade were not part of any required duty to be performed by these officials. Comment on the reasons for discharge of an employee is privileged and within the scope of official duty, for example, where requested by the unemployment compensation office for evaluation of an application. See *Shade* v. *Bowers, supra*. Comment on the discharge of an employee at the request of the media for public interest publication, on the other hand, falls short of the strict requirements and limited scope of an absolute privilege. Thus, plaintiff's argument that the court erred in finding Widmann's and Dopking's statements to be absolutely privileged is well-taken. However, the court couched its decision in the alternative, finding also that the statements made were not defamatory, and that no malice was shown.

Malice is the key factor where the communication in question is protected by a qualified privilege. The statement made can be defamatory, but absent any showing of actual malice on the part of the speaker, there will be no recovery where a qualified privilege exists. The burden of proving actual malice is on the plaintiff. *Hahn* v. *Kotten* (1975), 43 Ohio St. 2d 237 [72 O.O.2d 134]. As noted in *DeAngelo* v. *W.T. Grant Co.* (1952), 64 Ohio Law Abs. 366, where a qualified privilege applies, plaintiff must show actual malice, not implied malice or malice in law. The term was defined by the court as "* * * ill will, spite, grudge or some ulterior motive." *Id.* at 370. The United States Supreme Court has referred to actual malice as knowledge of the falsity of the statement, or reckless disregard for its truth or falsity. *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254. Before applying these definitions of actual malice to the statements made by Widmann and Dopking, it must be decided whether or not they were protected by a qualified privilege. For purposes of discussing qualified privilege only, we will temporarily assume that the statements in question could be found defamatory.

Qualified privilege, according to the court in *Hahn, supra*, applies to:

" ' "* * * A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. * * *" ' " *Id.* at 246.

The court continued, stating:

" ' "* * * 'All that is necessary to entitle such communications to be regarded as privileged is, that the relation of the parties should be such as to afford reasonable ground for supposing an innocent motive for giving information, and to deprive the act of an appearance of officious intermeddling with the affairs of others.' " ' " *Id.* at 246, citing *West* v. *Peoples Banking & Trust Co.* (1967), 14 Ohio App. 2d 69 [43 O.O.2d 197].

The record in this case shows that the media requested information on plaintiff's termination, at least from Widmann. The statements attributed to him were made when he answered a phone message left by a Blade employee. The court in *Hahn, supra,* observed:

" ' "It is generally held that if the defendant publishes the defamatory words to the person interested at the latter's request or solicitation, there is such a relationship between the parties to justify the communication. 'Everyone owes it as a duty to his fellowmen to state what he knows about a person, when inquiry is made; otherwise no one would be able to discern honest men from dishonest men. It is highly desirable, therefore, that a privilege of this sort should be maintained.' * * *"' ' " *Id.* at 246, citing *West, supra.*

A public interest was served by releasing this information to the press because TMHC was a vital part of the mental health community and, therefore, any major development in its operation, such as the hiring or termination of its superintendent, was of considerable importance to the residents of that community. Consequently, the acts of Widmann and Dopking in releasing the information could be perceived as the exercise of a "social duty of imperfect obligation" as described in the *Hahn* decision. As long as this kind of communication is made in a reasonable manner and for a proper purpose, it is protected by a qualified privilege. The

record reveals no evidence to suggest that Widmann or Dopking acted unreasonably. Both fulfilled their responsibility as public officers to supply a limited amount of information on a matter the public deserved to know about. As director of public relations and as the appointing authority in charge of personnel decisions, Dopking and Widmann were the logical suppliers of this information to insure its accuracy. They did not take the initiative in supplying the information, but, rather, responded to requests without offering additional information. Therefore, following *Hahn,* Widmann and Dopking were entitled to the protection of a qualified privilege with respect to the statements made to the Blade.

The next question is whether plaintiff proved actual malice on the part of either Widmann or Dopking, as would be required to recover for defamation where the declarant is protected by a qualified privilege.

Plaintiff failed to prove the presence of actual malice. Again, the statements were motivated by their responsibility, as public officers, to respond to the public on a matter affecting the community as a whole, and not by any ill will or desire to meddle into plaintiff's personal affairs. In regard to the specific comments made on the high overtime situation at TMHC, the record contains evidence to support defendants' statements of high overtime use at TMHC. Therefore, the trial court's finding that the statements were not made with reckless disregard for their truth or falsity, as required to show actual malice, is supported by the record.

Moreover, it is questionable whether the statements were even defamatory in nature. The statements did not allude to any improper behavior by plaintiff, nor were the comments aimed directly at his character. Rather, a brief and very general response was given to the media inquiries indicating only that a variety of reasons caused plaintiff's termination,

including his overall managerial performance and his handling of the overtime problem. Arguably, these statements prevented undesirable speculation aimed at plaintiff's character and, at the least, they provided necessary factual information detached from any comments of a personal nature affecting plaintiff. Thus, the trial court's finding that the statements were not defamatory is supported by the record. The first and fifth assignments of error are overruled.

For his second assignment of error, plaintiff contends that the court erred in refusing to remove the Attorney General as counsel for the state. The contention is based on an alleged conflict of interest stemming from the Attorney General's prior representation of Dr. Widmann in the Lucas County Court of Common Pleas. Plaintiff argues that Dr. Widmann was acting outside the scope of his authority when he made the statements to the Blade and, thus, would be liable to the state if the latter was required to pay damages to plaintiff for defamation, making Dr. Widmann an adverse witness and creating a conflict of interest for the Attorney General. This position lacks merit. Under R.C. 2743.14, the Attorney General is required to represent the state in all actions brought against it. In addition, R.C. 109.361 provides for representation by the Attorney General of state employees in civil suits brought against them. It must only be determined that the employee has not acted in bad faith or in a reckless manner, as the Attorney General will not defend an employee who has acted in this manner. R.C. 109.362(A).

Dr. Widmann did not act in a reckless or malicious fashion. Moreover, he would not be an adverse witness, as his actions in making statements to the Blade were not outside the scope of his duties as a public officer. As discussed previously, this matter affected the community as a whole and, therefore, the public had a right to know. The public interest in knowing that public affairs are conducted properly is of sufficient importance to be protected. Widmann acted well within the bounds of his duty in providing a brief factual explanation of plaintiff's termination. Accordingly, plaintiff's second assignment of error is overruled.

Plaintiff's third assignment of error is that the trial court erred in holding that Widmann and Dopking were acting within the scope of their authority in giving statements to the Blade. This argument is not well-taken for the reasons discussed with respect to the second assignment of error. However, plaintiff additionally charges defendants with violating former Ohio Adm. Code 5119-7-11(F)(4), pertaining to the department, which reads as follows, in pertinent part:

"Statement of Reasons. If the employee desires to have a written Statement of Reasons as to why the revocation of his unclassified appointment is being considered, the appointing authority shall provide same. The Statement of Reasons is considered to be a private communication between the appointing authority and the employee. The appointing authority shall therefore ensure that the Statement of Reasons remains confidential. It should not be maintained as part of the employee's personnel file * * *."

Defendants did not violate this rule. They testified that the written statement of reasons for plaintiff's termination was kept confidential, and plaintiff did not dispute that contention at any point in the trial. The statements made to the Blade were not part of this written statement. Therefore, plaintiff's argument that defendants violated this rule, thereby acting outside the scope of their authority, falls short. The third assignment of error is overruled.

Plaintiff's fourth and final assign-

ment of error is that the court erred in denying admission of his exhibit 11 at trial. The exhibit is a copy of the Department of Education's own investigative report made in connection with a complaint of racial discrimination filed by plaintiff against the department prior to his hiring as superintendent of TMHC. The report deals with the issue of whether, as charged by plaintiff, he was terminated in retaliation for filing the discrimination complaint. The trial court acted properly in refusing to admit this document for two reasons. First, the report is irrelevant to the issue plaintiff raised in his complaint, that being that certain statements made by Widmann and Dopking to the Blade defamed him. Second, the document plaintiff attempted to introduce was a copy of the original which had not been certified as required by Evid. R. 902 and Civ. R. 44.

In justification, plaintiff cited Evid. R. 1005 to the court, arguing that a copy is admissible where a witness can testify to its accuracy, having compared it with the original. The plaintiff was to be that witness in this case; he admitted that he never saw the original and, therefore, did not compare the two documents. Consequently, the trial court did not err in denying admission of the exhibit. The fourth assignment of error is overruled.

Plaintiff's assignments of error are overruled and the judgment of the Court of Claims is affirmed.

*Judgment affirmed.*

NORRIS and COOK, JJ., concur.

COOK, J., of the Eleventh Appellate District, sitting by assignment in the Tenth Appellate District.