OPINION
Plaintiff-appellant, M. Jeannette Smith, appeals a decision of the Warren County Court of Common Pleas granting summary judgment in favor of defendants-appellees, the Lebanon City School District Board of Education (the "Board"), Robert Harvey, and Steven Hinshaw.
In late 1995, appellant began working as a secretary in the Lebanon City Schools Treasurer's Office. Robert Harvey was the Lebanon City Schools Superintendent. Gary Furiss was the Lebanon City Schools Treasurer until he resigned in March 1996. Shortly thereafter, Steven Hinshaw became the new treasurer. Relations between appellant and Hinshaw were strained. While appellant received a positive performance evaluation from Furiss in February 1996, she received a negative performance evaluation from Hinshaw in August 1996. The evaluation listed four specific areas in which appellant's performance was deficient, to wit: not completing assigned tasks, not completing routine tasks, poor demeanor with other employees, and attendance. As a result of that evaluation, appellant was placed on a work improvement program with the admonition that if she were unable to improve her performance, Hinshaw would recommend her termination to to the Board.
One of appellant's responsibilities was to receive money in the form of cash and checks from various school organizations. The money was divided into two categories, "student activity money" and the "general money." When brought to the treasurer's office, the money was accompanied either by a "pay in order form" filled out by the student organization representative or by a piece of paper filled out by a school secretary. Each form indicated the amount of money brought and its source. The persons bringing money to the treasurer's office would not receive a receipt from appellant at that time, but would rely upon the form they had prepared to document the amount of money given to the treasurer's office. These persons would eventually receive a receipt at the end of each month, after the money received for that month was entered into a computerized accounting system.
At the end of each day, appellant was responsible for counting the general money and a co-worker was responsible for counting the student activity money. Appellant would sign the "pay in order" forms and equivalent documents only after she had counted the money and ascertained that it matched the amount listed. Thereafter, at the end of each day, appellant would deposit the money at the bank. The next day, the bank-stamped deposit slip would be attached to the previous day's forms. Appellant was the only employee in the treasurer's office to make the bank deposits.
In December 1996, the treasurer's office found seven pay in order forms totaling $933 for which there was no corresponding bank deposit slip. Neither the checks referred to in the pay in order forms nor the cash could be found. Appellant's signature was on the seven pay in order forms indicating she had received the money on December 11, 1996. Appellant could not produce the bank deposit slip.
On January 10, 1997, Hinshaw and his assistant, Ryan Sloan, discovered a box underneath appellant's desk. The box contained unopened mail, including invoices, certified mail that should have been mailed on December 4, 1996, $11.41 in change, and personal mail of appellant. On January 14, 1997, Hinshaw reported to the Lebanon City Police Department that about $7,400 was missing from the treasurer's office. At a January 15, 1997 meeting with Hinshaw and Dwight Goins, Lebanon City Schools Personnel Director, appellant admitted placing the box under her desk and knowing about its contents. Goins informed appellant that in light of the missing money and the under her desk, it was likely that she would be terminated.
On January 22, 1997, appellant received a letter from Hinshaw indicating his intention to recommend her termination to the Board at its February 3, 1997 meeting for "incompetency, inefficiency, neglect of duty, failure of good behavior, misfeasance and nonfeasance. Specifically, [her] fail[ure] to accurately and fully account for certain monies belonging to the School District placed in [her] care to the extent that these monies were not properly deposited with the bank." On January 28, 1997, appellant received a second letter from Hinshaw indicating that he would also recommend her termination because she had failed to report to work on several days.
On January 29, 1997, the Cincinnati Enquirer published an article reporting a theft of more than $7,000 from the Lebanon City School District and the impending termination of the suspect at an upcoming Board's meeting. Specifically, the article stated in relevant part that "[p]olice are talking to several school employees who handled some of the missing money, Assistant Police Chief Bob Hawley said. He said the investigation is just beginning. Neither police nor school officials would identify the suspect * * *. Superintendent Robert Harvey said police have talked with the five people who work in the treasurer's office. Treasurer Steve Hinshaw, who reported the money missing * * * is not under investigation, Mr. Harvey said. * * * The person, Mr. Harvey says is responsible for the theft will be terminated at Monday's board meeting, `not just because of the missing money, but because of several other reasons,' he said. He didn't elaborate."
On February 3, 1997, the Board held a meeting. The agenda of that meeting included an executive session to consider "[t]he appointment, employment, dismissal, discipline, promotion, demotion, or compensation of an employee, official or student or the investigation of charges or complaints against such individual." The agenda did not identify the person whose status was to be addressed during the executive session. Following the Board's closed executive session, at which neither appellant nor her attorney were present, appellant submitted a signed handwritten resignation letter dated February 3, 1997. The Board accepted appellant's resignation.
The police investigation of the $7,400 theft concluded that "due to the operating procedures" of the treasurer's office, it was impossible "to trace the loss of these funds to and from any one source * * * [and] to either confirm or deny that any monies were in fact stolen and that these funds could have been lost during the times in question." The police investigation concluded that there was no probable cause to arrest anyone.
On April 8, 1997, appellant filed a verified complaint in the trial court against all three appellees alleging causes of action for (1) defamation, (2) discrimination by reason of disparate pay, discipline as retribution and hostile environment, and (3) intentional infliction of emotional distress. On October 6, 1998, appellees filed a motion for summary judgment. By decision filed January 13, 1999, the trial court granted appellees' motion for summary judgment. This timely appeal follows.
In her sole assignment of error, appellant argues the trial court erred in granting summary judgment in favor of appellees. Appellant first contends that it was error to grant summary judgment regarding her defamation claim where, "although not specifically named in the defamatory matter, [her] identity [was] obvious or readily ascertainable." Appellant also contends that summary judgment regarding her intentional infliction of emotional distress claim was inappropriate because she had "provide[d] evidence with regard to each element of such claim." Finally, appellant contends that summary judgment regarding her employment discrimination was inappropriate because she had "provide[d] evidence with regard to each element of such claim."
This court reviews a trial court's decision to grant summary judgment de novo. Jones v. Shelly Co. (1995), 106 Ohio App.3d 440,445. Under Civ.R. 56(C), a motion for summary judgment is properly granted if the court, upon viewing the evidence in the light most favorable to the party against whom the motion is made, determines that: (1) there are no genuine issues as to any material facts; (2) the movant is entitled to a judgment as a matter of law; and (3) the evidence is such that reasonable minds can come to but one conclusion and that conclusion is adverse to the opposing party. Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317,327.
Appellant first argues that the trial court erred in granting summary judgment in favor of appellees with regard to her defamation claim. Appellant contends that genuine issues of material fact exist as to whether the statements attributed to Harvey in the Cincinnati Enquirer article were made by him and as to whether the identity of the person defamed by Harvey's statements was obvious or readily ascertainable and that such person was appellant.
The article, written by Linda Fish-Oda, reported the theft of more than $7,000 from the Lebanon City School District and stated that the police were talking to several school employees who handled some of the missing money. The article stated that neither the police nor school officials would identify the suspect. The article quoted Harvey as saying that the police had talked with the five people who work in the treasurer's office and that the person responsible for the theft was going to be terminated ar an upcoming Board's meeting "not just because of the missing money, but because of several other reasons." The article never mentioned appellant. Likewise, the agenda for the Board's February 3, 1997 meeting and executive session never mentioned appellant or the office of the individual whose status was going to be addressed at the meeting.
In her affidavit, appellant stated that several articles appeared in the Cincinnati Enquirer and the Middletown Journal indicating that $7,000 had been stolen from the treasurer's office and that an employee of that office was guilty and going to be terminated at the February 3, 1997 Board's meeting. Appellant stated that it was clear to her and her family and friends that she was the subject employee that was to be terminated for the theft.
In her deposition, appellant agreed that the Cincinnati Enquirer article did not mention her name and that school officials would not identify the person referred to in the article. Appellant stated, however, that the comment attributed to Harvey that a person to be fired at the Board's meeting was the person who had committed the theft was untrue. Appellant admitted she had no evidence that officials provided her name to Fish-Oda as the person referred to in the article. Appellant also admitted that the only knowledge she had about what Harvey may or may not have said to Fish-Oda prior to the publication of the article was the contents of the article itself.
In an affidavit attached to appellees' motion for summary judgment, Harvey stated that
 7. The Superintendent of Schools as chief executive is the overseer of daily operations and administers the schools following policies adopted by the Board and in accordance with the law.
* * *
 13. On either January 27 or January 28, 1997, Linda Fish-Oda, a reporter for the Cincinnati Enquirer, called me indicating that she had a copy of a police report that was filed about missing money in the school district and requested that I talk about it.
 14. I indicated to her that I was not willing to discuss that with her.
 15. She then asked me about the agenda for the upcoming meeting of the Board on February 3, 1997, which was very typical for her to do, because the Board is required to notify the media of the agenda.
 16. In response I told her in general what at that time was on the agenda for the upcoming meeting which had not been finalized at that point.
 17. I told her that there was going to be an item on the agenda that was going to be in executive session for personnel.
 18. I told her that the Board was going to consider the dismissal of an employee.
 19. I did not indicate to her that it was in connection with or because of missing money.
 20. She asked me if the issue of the missing money was going to come up at the meeting and I responded that was something that may come up in discussion with the Board but that I didn't know.
 21. I said nothing further to her regarding the issue of missing money in the School District, Jeannette Smith or the specific amount of money missing.
 22. I did not say to her that "more than $7,000 has been stolen from the Lebanon City School District, and a suspect is expected to be fired at Monday's board meeting."
 23. I did not say to her that "the person responsible for the theft will be terminated at Monday's meeting, `not just because of the missing money, but because of several other reasons.'"
* * *
 25. I saw the article the day it came out and was upset because the article improperly attributed statements to me.
* * *
 28. As Superintendent of the Lebanon City Schools I believed that I had a duty to respond to the inquiries of Linda Fish-Oda regarding the agenda of the Board meeting scheduled for February 3, 1997.
 29. My response to the inquiries of Linda Fish-Oda regarding the agenda of the Board meeting scheduled for February 3, 1997 was made in good faith.
* * *
 44. I have made no false statements regarding Jeannette Smith at any time.
 45. Any statement that I have made at any time regarding Jeannette Smith or the issue of missing money in the Treasurer's Office was made in good faith belief that I had the duty to make statement and with a good faith belief of the truth of the statement.
* * *
In Ohio, liability for defamation generally exists when a false and defamatory statement about a person is published to a third person. Ball v. British Petroleum Oil (1995), 108 Ohio App.3d 129,135. The publication of defamatory matter is an essential element to liability for defamation. Lawson v. AK SteelCorp. (1997), 121 Ohio App.3d 251, 256. "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed. * * * Any act by which the defamatory matter is communicated to a third party constitutes publication." (Emphasis sic.) Ball at 136. If the defamatory statement is privileged, however, liability will attach only if actual malice is proved. Id. at 135.
After reviewing the pleadings, the affidavits filed in the instant case, and appellant's deposition, we find that the statements attributed to Harvey were not defamatory because they were protected by a qualified privilege. We further find no evidence to support a claim of actual malice on Harvey's part.
"A publication is * * * qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do." Hahn v. Kotten (1975),43 Ohio St.2d 237, 245-246. "The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and puvlication in a proper manner and to proper parties only." (Emphasis deleted.)Id. at 244.
Qualified privilege has also been defined as "[a] statement * * * where a commonality of interest exists between the publisher and the recipient and the communication is of a kind reasonably calculated to protect that interest." Creps v. Waltz (1982),5 Ohio App.3d 213, paragraph two of the syllabus. "It is generally held that if the defendant publishes the defamatory words to the person interested at the latter's request or solicitation, there is such a relationship between the parties to justify the communication. Everyone owes it as a duty to his fellow men to state what he knows about a person, when inquiry is made; * * * it is highly desirable, therefore, that a privilege of this sort should be maintained." Hahn at 246.
In the case at bar, the interests of Harvey (and of appellees in general) in the subject matter upon which he communicated is obvious. Harvey, as the superintendent, was responsible for the total operation of the school district, including its financial condition. "[T]he condition of school finances is a matter of vital interest to the community. The public has a right to know how its tax dollars are being spent [and whether they are being misused]." Christian v. Beacon Journal Publishing Co. (June 11, 1986), 1986 Ohio App. LEXIS 7155, at *9, Summit App. No. 12368, unreported. Harvey "fulfilled [his] responsibility as [a] public officer to supply a limited amount of information on a matter the public deserved to know about. As [superintendent of the school district, he was] the logical supplier of this information to ensure its accuracy. [He] did not take the initiative in supplying the information, but, rather, responded to requests without offering additional information." Wrenn v. Ohio Dept. ofMental Health and Mental Retardation (1984), 16 Ohio App.3d 160,163. The recipient of the communications was the newspaper reporter who published the statements in the article she wrote. "Members of the news media are proper recipients where the public has an interest in the subject matter." Christian at *8. In light of the foregoing and following Hahn, we find that Harvey was entitled to the protection of the qualified privilege with regard to the statements allegedly made to the Cincinnati Enquirer.
"Malice is the key factor where the communication in question is protected by a qualified privilege. The statement made can be defamatory, but absent any showing of actual malice on the part of the speaker, there will be no recovery where a qualified privilege exists. The burden of proving actual malice is on the plaintiff."Wrenn at 162. Actual malice is knowledge that the statement is false or the statement is made with reckless disregard for its truth or falsity. New York Times v. Sullivan (1964),376 U.S. 254, 279-280, 84 S.Ct. 710, 726. Actual malice has also been defined as "ill will, spite, grudge or some ulterior motive."Hahn, 43 Ohio St.2d at 248.
We find that appellant failed to prove the presence of actual malice. Harvey's statements were motivated by his responsibility, as a public officer, to respond to the public on a matter affecting the community as a whole. Appellant has failed to prove that the statements were motivated by any ill will, spite, or grudge, or that they were made in reckless disregard for their truth or falsity. We therefore find that the trial court did not err in granting summary judgment in favor of appellees with regard to appellant's defamation claim.
Appellant also argues that the trial court erred in granting appellees' motion for summary judgment with regard to her claim of intentional infliction of emotional distress. Appellant contends that Hinshaw's acts of screaming at her, "consistently yelling and slamming doors," falsely accusing her of causing serious problems in the treasurer's office and eventually of stealing money, "repeatedly" berating her in front of other people, calling her "moronic and uneducated," and berating her for being a woman were so outrageous and extreme as to constitute intentional infliction of emotional distress.
In an affidavit attached to her response to appellees' motion for summary judgment, appellant stated that "[d]uring the fall of 1996, the working atmosphere [at the treasurer's office] had deteriorated severely due to the workload and * * * Hinshaw's increasingly abusive behavior towards [her] * * *. * * * Hinshaw would repeatedly scream at [her] * * * in front of other employees degrading [her] intelligence and stated that as a woman [she] was too emotional to perform [her] job competently." Appellant also alleged that Hinshaw criticized her on several occasions for covering a co-worker's mistakes.
In her deposition, appellant testified that Hinshaw yelled at her on eight to ten occasions because of work either not performed or not properly performed. Appellant could remember only one such occasion and could not remember what Hinshaw said at that time. While on appeal appellant alleges that Hinshaw "consistently" slammed doors, she testified in her deposition that Hinshaw slammed a door on three occasions. Appellant could not remember when or why it happened.
Appellant also testified that Hinshaw created a hostile work environment by reassigning tasks, by having mood swings which included not talking to her, and by trying to pit employees against one another. Appellant described three occasions where Hinshaw allegedly tried to pit employees against one another. Appellant also testified that Hinshaw never accused her of stealing money and that there was no evidence that Hinshaw's conduct towards her was motivated by her gender.
Intentional infliction of emotional distress occurs when "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another * * *."Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 374, quoting Restatement of the Law 2d, Torts (1965) 71, Section 46(1). "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Yeager at 374-375, quoting Restatement, at Section 46, commented. "Actionability of [a] particular conduct must be judged by the objective standards of the community, not by a particular plaintiff's subjective sensibilities." Ullmann v. Olwine,Connelly, Chase, O'Donnell Weyher (S.D. Ohio 1987),123 F.R.D. 237, 252, citing Reamsnyder v. Jaskolski (1984), 10 Ohio St.3d 150.
After reviewing the pleadings and the deposition and affidavit of appellant, we are unable to find facts that would remotely reach the level of "extreme and outrageous conduct" required by the supreme court in Yeager. Liability for intentional infliction of emotional distress "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. * * * [P]laintiffs must necessarily be expected to and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Yeager at 375, quoting Magruder, Mental and Emotional Disturbance in the Law of Torts (1936), 49 Harv.L.Rev. 1033, 1053.
We therefore find that the trial court did not err in granting summary judgment in favor of appellees with regard to appellant's claim of intentional infliction of emotional distress.
Finally, appellant argues the trial court erred in granting appellees' motion for summary judgement with regard to her employment discrimination claim. Appellant contends that Hinshaw's hostility toward her, which she contends was motivated at least in part by her gender, clearly constituted discrimination relating to the terms or conditions of her employment.
We note at the outset that appellant's complaint does not allege that Hinshaw's behavior toward her was motivated, even in part, by her gender. Rather, appellant's complaint alleges employment discrimination as evidenced by the hostile environment previously described, by a reduction in her paycheck in January 1997, and by Hinshaw formally disciplining her on January 15, 1997.
R.C. 4112.02(A) makes it unlawful for "any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." To establish a prima facie case of discrimination, the employee must demonstrate that (1) he was a member of the statutorily protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position either lost or not gained, and (4) he was replaced by, or that his discharge permitted the retention of a person not belonging to the protected class. Wall v. Firelands Radiology, Inc. (1995), 106 Ohio App.3d 313,330. See, also, Byrnes v. LCI Communication Holdings Co.
(1996), 77 Ohio St.3d 125. Thus, to prevail on her discrimination claim, appellant must prove that Hinshaw's alleged discriminatory motives were based on her being a woman.
In her affidavit, appellant only refers to two instances where Hinshaw made gender-based comments to her. During the fall of 1996, Hinshaw allegedly stated to appellant that as a woman, she was too emotional to perform her job competently. Hinshaw allegedly also told another female co-worker that she too, as a woman, was too emotional to perform her job competently. In October 1996, after that co-worker left a meeting with Hinshaw and appellant in tears, Hinshaw allegedly commented that crying was a typical response for a woman. Apart from these two instances, appellant generally contends that Hinshaw berated her for being a woman. However, in her deposition, appellant testified that there was no evidence that any act or omission by Hinshaw, Harvey, or the Board was motivated by her gender (or her race, religion, or national origin). In January 1997, appellant received two letters from Hinshaw indicating his intention to recommend her termination for failing to report to work for several days and for failing to "accurately and fully account for certain monies belonging to the School District placed in [her] care * * *." None of the reasons offered for termination were gender-based.
"Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision." Wall,106 Ohio App. 3d at 329, quoting Price Waterhouse v. Hopkins (1989),490 U.S. 228, 109 S.Ct. 1775. "Stray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Such remarks, as offered by the plaintiff, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision-maker * * *." Smith v. Firestone Tire and Rubber Co.
(C.A.7, 1989), 875 F.2d 1325, 1330.
After reviewing the pleadings, the affidavits attached by appellant to her response to appellees' motion for summary judgment, and appellant's deposition, we find that appellant has failed to establish a link or nexus between Hinshaw's comments and his intention to recommend her termination that could logically support the inference that his recommendation was the result of discriminatory intent. Similarly, there is no link or nexus between Hinshaw's comments and his hostility towards appellant, the disciplinary action taken against her, and the reduction of her paycheck that could support the inference that Hinshaw's actions and behavior were the result of discriminatory intent.
"Intentional discrimination cannot be proven by conclusory allegations made by the charging party." Hollowell v. SocietyBank Trust (1992), 78 Ohio App.3d 574, 581. Similarly, "self-serving statements by the charging party that he believes he was discriminated against because of [sex] are not enough." Id.
Because appellant has failed to provide the requisite nexus between Hinshaw's statements and his subsequent actions with regard to her to demonstrate that appellant's gender was a substantial factor in Hinshaw's actions, we find that the trial court did not err in granting summary judgment in favor of appellees with regard to appellant's employment discrimination claim. Appellant's sole assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and YOUNG, J., concur.